Robert and Christine LaPETINA,
Plaintiffs-Appellants,

v.

METRO FORD TRUCK SALES, INC.,
Defendant-Appellee.

No. 80–2208
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

June 16, 1981.

Wm. Andress & Associates, P. C., Gordon Bogen, Dallas, Tex., for plaintiffs-appellants.

Ted L. Tittsworth, J. Dan Connelly, Arlington, Tex., for defendant-appellee.

Before GEE, RUBIN and RANDALL, Circuit Judges.

PER CURIAM:

This appeal arises from a judgment in favor of the defendant in an action brought under the Texas Consumer Credit Code (the Code), Tex.Rev.Civ.Stat.Ann. art. 5069 (Vernon 1980 Supp.). Although the defendant does not contest the fact that it contracted for an excessive time-price differential in a motor vehicle retail installment contract, the defendant did successfully maintain in the district court that this ex-

cessive rate was the result of a "bona fide error" and was therefore protected from Code penalties by Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(f). We find, however, that the defendant's mistake resulted from its agent's misreading of the applicable provision of the Code; since the bona fide error defense extends only to clerical errors, we reverse the judgment of the district court and remand this case for proceedings consistent with this opinion.

## I. THE FACTS

On May 1, 1978, Robert LaPetina contracted with Metro Ford Truck Sales, Inc. (Metro) for the purchase of a 1974 commercial tractor truck; the purchase order signed by LaPetina named both himself and his wife, Christine LaPetina, as purchasers and was conditioned on a favorable credit check. At this time Christine LaPetina was at the LaPetinas' residence in New York, but on May 12, Metro informed Robert LaPetina that, because of an unfavorable credit report, his wife would be required to come from New York to Texas to sign the purchase documents.

A retail installment contract and a new purchase order were thereupon prepared by Robert Keever, the salesman handling the transaction. In computing the maximum allowable time-price differential, Keever (who had been employed by Metro for less than one month) erroneously calculated the age of the truck[1] and consequently employed a rate (15%) in excess of the statutory maximum (12½%) applicable to this retail installment contract under Tex.Rev.Civ. Stat.Ann. art. 5069–7.03(1).[2] The total time-price differential added to the contract price by Keever was $4,774.75; the maximum legal amount would have been $3,979.39. A retail installment contract and a new purchase order (both of which included the erroneous rate) were executed by Christine LaPetina on May 20 and by Robert LaPetina on or about May 22.

1. Keever explained as follows his erroneous calculation of the time-price differential:

Q. ... Concerning the mistake that you made in the original retail installment contract, how did that mistake occur?

A. The State usury laws called at that time for us to be able to charge a maximum interest rate of seven and a half percent on a new vehicle. We could charge ten percent on a vehicle that was one year, two years or three years old. A truck that was four years old, we could charge twelve and a half percent interest. A truck five years old or older, we could charge fifteen percent interest. And not being experienced in the business, the problem that I encountered was counting up the age of the truck and what interest rate would qualify and I counted it to be five years old and—

Q. Explain to the Court, if you would, how you could make that mistake, how you could have counted wrong on that.

A. Because of the way that—

Q. It was a '74 Diamond rig?

A. Right.

Q. This transaction occurred May 1st, 1978?

A. Right.

Q. So how could you make that mistake?

A. Well, the new year models are basically released in September or October of the preceding year just like now the '81 model trucks are coming out. And the question gets to be, is a truck a year old when a newer model comes out or is a truck a year old on January 1st after its manufacturing date or is it a year old—a year older after the date of manufacture which is on all trucks on the plate.

Q. So if it was a '74, '75, '76, '77, '78 and that occurred within two months of the new models coming out which would have been the '79's, you could either have considered it to be five or six years old?

A. Right.

Trial Transcript at 51–52.

2. Tex.Rev.Civ.Stat.Ann. art. 5069–7.03(1) (Vernon 1980 Supp.) provides in pertinent part as follows:

Notwithstanding the provision of any other law, the time price differential in a retail installment contract payable in substantially equal successive monthly installments beginning one month after the date of the contract shall not exceed ... an amount determined under the following schedule:

. . . .

Class 3. Any used motor vehicle not in Class 2 and, if a domestic motor vehicle, designated by the manufacturer by a year model not more than four years prior to the year in which the sale is made, and, if a foreign motor vehicle, not more than four years old—Twelve Dollars and Fifty Cents per One Hundred Dollars per annum.

Class 4. Any used motor vehicle not in Class 2 or Class 3—Fifteen Dollars per One Hundred Dollars per year.

Sometime between May 20 and May 26, Metro discovered Keever's error through internal procedures designed by Metro to catch such errors,[3] and returned the retail installment contract to Keever for correction. Keever thereupon took the following actions: (1) he changed the time-price differentials in both documents to the correct legal maximum and had Robert LaPetina initial the changes on May 26; and (2) he mailed to Christine LaPetina soon afterwards a payment booklet correctly reflecting the lowered monthly payment as the actual obligation, although the fact that the rate had been lowered was not itself noted in the booklet. Keever did not, however, undertake several other important actions: (1) he did not request Christine LaPetina to initial the interest rate changes on the two documents; (2) he did not send a copy of either of the modified documents to either of the LaPetinas; and (3) he did not send written notice to either of the LaPetinas that a violation of the Consumer Credit Code had been committed.

On May 26, Robert LaPetina paid Metro the remaining down payment and took possession of the truck. On July 6, Christine LaPetina sent to Metro the first and only monthly payment check; the LaPetinas subsequently defaulted in their payments and Metro foreclosed its security interest in the truck. In accordance with the payment booklet, the one check sent by the LaPeti-

nas did not include any excessive interest. At no time, in fact, did either Robert or Christine LaPetina make any payment of excessive interest, and neither had any knowledge of the erroneous rate until it was corrected.

In this action[4] the LaPetinas have asserted two alternative claims under the Texas Consumer Credit Code.[5] First, they allege that Metro contracted for a time-price differential in excess of the maximum permitted by Tex.Rev.Civ.Stat.Ann. art. 5069–7.03(1), *supra* at note 2; for this violation they seek as a statutory penalty twice the amount of the time-price differential contracted for plus their attorneys fees, all in accordance with Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(a).[6] Second, the LaPetinas allege that Metro violated Tex.Rev.Civ.Stat.Ann. arts. 5069–7.02(4) and 7.05(1)(b) by failing to deliver to the LaPetinas a copy of the amended contract after Metro discovered and corrected the erroneous time-price differential; for this violation they seek a statutory penalty of $4,000, the maximum amount allowed for this violation under Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(b).[7]

The district court ruled in Metro's favor on both counts, despite its conclusions that Metro had indeed violated both article 5069–7.03(1) and article 5069–7.02(4). With respect to the first count, as to which we reverse the judgment of the district court, the court held that Metro had a valid de-

---

3. Metro introduced testimony to the effect that a salesman's calculations in a used truck transaction were checked by a number of other persons in the company, including the used truck manager, the general sales manager, a title clerk and an accounting office clerk. Trial Transcript at 66–68.

4. Jurisdiction is founded on diversity of the parties, as the LaPetinas are both New York citizens and Metro is a Delaware corporation licensed to do business in Texas.

5. The LaPetinas originally asserted a claim under the Texas Deceptive Trade Practices Act, Tex.Bus. & Comm.Code Ann. § 17.41 *et seq.* (Vernon 1968), but this claim was dismissed on motion of the LaPetinas.

6. Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(a) (Vernon 1980 Supp.) provides as follows:

Any person who violates this Subtitle by contracting for, charging or receiving interest, time price differential or other charges which are greater than the amount authorized by this Subtitle, shall forfeit to the obligor twice the amount of interest or time price differential and default and deferment charges contracted for, charged or received, and reasonable attorneys' fees fixed by the court.

7. The district court ruled in favor of Metro with respect to Metro's alleged violation of articles 5069–7.02(4) and 7.05(1)(b). Although this ruling is contested on appeal, we need not consider its validity for, as determined *infra*, the LaPetinas are entitled to recover a statutory penalty under article 5069–8.01 on the basis of Metro's contracting for a time-price differential which was excessive under article 5069–7.03(1).

fense by virtue of Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(f), which exempts from the penalties of the Code all unintentional bona fide errors committed notwithstanding the maintenance of procedures reasonably adopted to avoid such errors.[8] Since the LaPetinas do not challenge the court's conclusion that Metro maintained procedures reasonably adopted to correct errors such as that made by Keever in this case, the validity of the court's decision rests on its characterization of Keever's mistake as an unintentional "bona fide error" under the Code. We now turn to that characterization.

## II. WAS KEEVER'S MISTAKE A "BONA FIDE ERROR" UNDER ARTICLE 5069–8.01(f)?

Metro stipulated before trial that Keever's initial calculation of the time-price differential was in excess of the statutory maximum under article 5069–7.03(1), *supra* at note 2; the district court found (and Metro does not contest on appeal) that this excessive rate initially was incorporated into Metro's contract with the LaPetinas. Therefore Metro's sole defense to this viola-tion is that Keever's miscalculation was a "bona fide error" under article 5069–8.01(f), *supra* at note 8.[9] As noted above, the district court accepted this defense and ruled in favor of Metro. In particular, the court found that Keever had "determined the truck's age by counting erroneously," and characterized the mistake as "a clerical counting error" which, because the other requirements of the article were met, was a "bona fide error" under article 5069–8.-01(f).[10]

On appeal, the LaPetinas' argument is two-fold: first, they contend that article 5069–8.01(f) provides a defense only for clerical errors and not for a good-faith misreading of the Code; and second, they contend that the mistake made by Keever was not a clerical error (as characterized by the district court) but was instead the result of his admittedly good-faith misreading of article 5069–7.03(1). We agree with both parts of the LaPetinas' argument.

The Texas courts have not reached the precise question whether a good-faith misreading of the Code constitutes a defense under article 5069–8.01(f), but recent cases

---

**8.** Tex.Rev.Civ.Stat.Ann. art 5069–8.01(f) (Vernon 1980 Supp.) provides in pertinent part as follows:

A person may not be held liable in any action brought under this Article for a violation of this Subtitle or of Chapter 14 of this Title if such person shows by a preponderance of evidence that . . . the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adopted to avoid such violation . . . .

**9.** A number of other defenses were initially raised in the district court but are not urged on appeal. These include Metro's claims that the time-price differential was reduced upon its discovery and prior to the due date for the first installment; that the excessive rate was never incorporated into a binding contract; that Robert LaPetina initialed the changes lowering the rate to the correct legal maximum; that the LaPetinas were given written notice of the lower rate prior to the due date for the first installment; and that Metro's conduct was in compliance with the legislative intent expressed in the Code. Pre-Trial Order at 2, Record at 71.

**10.** The pertinent findings and conclusions of the court are in full as follows:

[Finding of Fact] 3. In preparing the document which would reflect the new financing arrangement, Keever, who had begun work with Metro only about a month earlier, determined the truck's age by counting erroneously, resulting in his use of a 15% rather than a 12½% interest rate.

. . . .

[Finding of Fact] 11. The changes made in the retail installment contract and the new purchase order agreement, i. e., the lowering of the interest rate charged, resulted wholly from the discovery through internal procedures designed by Metro to catch such errors.

. . . .

[Conclusion of Law] 1. Keever's erroneous calculation of the interest rate was a clerical counting error, and was therefore a bona fide error as provided for in V.A.T.S. art. 5009–8.03(f) (sic).

[Conclusion of Law] 2. Because Keever's error was not intentional, was a bona fide error, and was made notwithstanding procedures reasonably adopted to avoid such errors, Metro may not be held liable for the initial act of contracting to charge an excessive interest rate.

Record at 92, 95.

indicate that the defense does not protect creditors who intended to contract for, charge or receive the interest rate at issue in the case merely because those creditors did not understand that the rate was in fact excessive. As one court of civil appeals has explained:

> If [the creditor] intended to do the acts which constituted the charging of the excessive time-price differential, then those acts were not the result of an accidental or *bona fide* error. A creditor may not excuse its violation of the statute by a showing that it did not intend to violate the act.

*Moore v. Sabine National Bank of Port Arthur,* 527 S.W.2d 209, 213 (Tex.Civ.App. —Austin 1975, writ ref'd n. r. e.) (citations omitted). *See also Hight v. Jim Bass Ford, Inc.,* 552 S.W.2d 490, 492 (Tex.Civ.App.— Austin 1977, writ ref'd n. r. e.). The Texas Supreme Court used similar language in a recent case involving article 5069–1.06(1), in which an analogous bona fide error defense is allowed to the general usury statute.[11] Although the defendant had not directly raised that defense, the court underscored the irrelevance of the creditor's subjective intent, an issue which was specifically raised by the creditor:

> [T]he jury's responses to the issues concerning [the creditor's] intent to obtain interest in excess of ten percent are immaterial. Intent in usury cases does not mean intent to charge a usurious rate of interest. Rather, it means intent to make the bargain made.

*Cochran v. American Savings & Loan Association of Houston,* 586 S.W.2d 849, 850 (Tex.1979) (on rehearing). If, as these cases indicate, the determinative question is whether the creditor *intended to charge the rate at issue* and not whether the creditor *intended that the rate be excessive,* then a

creditor's good-faith mistake as to the rate allowed by the statute cannot constitute a defense. Such a good faith misreading of the statute may indicate a lack of intent to contract for, charge or receive an illegal rate of interest or time-price differential, but it does not implicate the creditor's "intent to make the bargain made" and therefore does not appear to constitute a defense under article 5069–8.01(f).

This conclusion is buttressed by the result reached in federal cases involving the bona fide error defense provided in the federal Truth In Lending Act. *See* 15 U.S.C. § 1640(c) (1976). That provision, which is identical in all relevant respects to the state provision at issue here, has uniformly been held applicable only to clerical errors and inapplicable to errors resulting from a good-faith misreading of the relevant statutes. *See, e. g., Thomka v. A. Z. Chevrolet, Inc.,* 619 F.2d 246, 250–51 (3d Cir. 1980); *McGowan v. King, Inc.,* 569 F.2d 845, 849 (5th Cir. 1978); *Mirabal v. General Motors Acceptance Corp.,* 537 F.2d 871, 879 (7th Cir. 1976); *Ives v. W. T. Grant Co.,* 522 F.2d 749, 757–58 (2d Cir. 1975); *Palmer v. Wilson,* 502 F.2d 860 (9th Cir. 1974).[12] This interpretation rests heavily on the legislative history of the statute, which originally was intended to create strict liability for its violation. The bona fide error defense was added only to protect against liability for mathematical and transcription errors; these mistakes are inevitable in complex interest calculations such as those required by the statute and therefore could not be prevented by any threat of strict liability. *See Thomka v. A. Z. Chevrolet, Inc., supra* at 250–51; *Ratner v. Chemical Bank New York Trust Co.,* 329 F.Supp. 270, 281–82 & 281 n.17 (S.D.N.Y.1971).

As we read the bona fide error defense, therefore, the determinative question is

---

11. Tex.Rev.Civ.Stat.Ann. art. 5069–1.06(1) (Vernon 1980 Supp.) provides in pertinent part as follows:

> Any person who contracts for, charges or receives interest which is greater than the amount authorized by this Subtitle, shall forfeit to the obligor three times the amount of usurious interest contracted for, charged or

received . . .; provided, that there shall be no penalty for any usurious interest which results from an accidental and bona fide error.

12. *But see Thrift Funds of Baton Rouge, Inc. v. Jones,* 274 So.2d 150, 161 (La.) (Tate, J.), *cert. denied,* 414 U.S. 820, 94 S.Ct. 115, 38 L.Ed.2d 53 (1973).

whether Keever's mistake was a clerical error (as characterized by the district court) or was instead an erroneous reading of the statute (as urged by the LaPetinas). The sole evidence introduced on this question is the relevant portion of Keever's testimony, Trial Transcript at 51–52, *supra* at note 1. That testimony clearly demonstrates that the source of Keever's mistake was his misunderstanding of the proper method to calculate the age of a motor vehicle under article 5069–7.03(1), *supra* at note 2. The maximum allowable time-price differential under that statute depends on the age of the vehicle: a creditor may charge only 12½% on the sale of a four-year-old vehicle but may charge 15% on the sale of a five-year-old vehicle. Although Keever's somewhat confusing testimony does not clearly explain how he computed the age of the truck sold to the LaPetinas, it does demonstrate that his error was not a mere mis-addition of the low numbers involved; the emphasis in Keever's testimony is rather on the confusion surrounding proper calculations of age under the article—*i. e.*, on Keever's misunderstanding of the operation of the statute. We conclude therefore that Keever's mistake arose from a good-faith misreading of the statute and not from a clerical error, and that consequently the bona fide error defense of article 5069–8.01(f) is not available in this case.[13]

This result may seem unjust, for Metro corrected its mistake before any excessive interest was charged and the LaPetinas suffered no harm by virtue of this transaction. However, our holding must be read in the context of an alternative Code defense and of the legislative purpose behind the rigorous penalty provisions of the Code. In the first place, the Code does provide a defense which is sufficient to protect those creditors in situations like that now before us who carefully comply with a statutory provision allowing creditors to correct their mistakes. Article 5069–8.01(c)(1) allows a creditor who has discovered a violation of the Code to correct that violation if he does so within sixty days of its discovery and before the consumer either files an action on the violation or provides written notice thereof to the creditor.[14] However, this article requires *written notice to the consumer of the creditor's violation.* See, e. g., *Portland Tradewinds Ford v. Lugo,* 613 S.W.2d 26, 29–30 (Tex.Civ.App.—Corpus Christi 1981, no writ); *Jim Walter Homes, Inc. v. Gibbens,* 608 S.W.2d 706, 710–12 (Tex.Civ.App.—San Antonio 1980, writ ref'd n. r. e.). No such notice was provided by Metro to the LaPetinas and Metro does not raise this defense on appeal.[15]

■ In the second place, the penalty provisions of the Code are not designed to compensate consumers for damages actually incurred, but are instead "purely penal in

**13.** Since the district court did not define the phrase "clerical counting error" as used in its opinion, *supra* at note 10, we are unable to determine whether our difference with that opinion is based on legal or factual grounds. If the district court intended a definition of "clerical error" so broad as to encompass Keever's mistake as we understand it, *i. e.*, as a good-faith misreading of the statute, then the court's conclusion is wrong as a matter of law; if the court instead intended to find as a matter of fact that Keever's actions constituted a clerical error as that term is used in this opinion, *i. e.*, as a mathematical or transcription error, then we hold its finding to be clearly erroneous.

**14.** Tex.Rev.Civ.Stat.Ann. art. 5069–8.01(c)(1) (Vernon 1980 Supp.) provides in pertinent part as follows:

A person has no liability to an obligor for a violation of this Subtitle or Chapter 14 of this Title if within 60 days after having actually discovered such violation such person corrects such violation as to such obligor by performing the required duty or act or by refunding any amount in excess of that authorized by law; provided, however, that such person gives written notice to such obligor of such violation prior to such obligor having given written notice of or having filed an action alleging such violation of this Subtitle or of Chapter 14 of this Title.

**15.** Metro did, however, require Robert LaPetina to initial the changes on Metro's copy of the purchase order and retail installment contract, and did send to Christine LaPetina a correctly calculated payment booklet. But since Metro does not argue on appeal that these acts constitute adequate notice under article 5069–8.01(c)(1), we need not consider the applicability of that article to the facts of this case.

nature." *Zapata v. Ford Motor Credit Co.,* 615 S.W.2d 198, 199 (Tex.1981). This system is intended to facilitate enforcement of the Code by individual consumers despite the small sums ordinarily at stake. As one court of civil appeals has explained:

The penalty provision is not designed to compensate the consumer for actual damages but instead is to deter violators and to encourage enforcement of the Code by private litigants, rather than placing the entire enforcement burden on the Consumer Credit Commissioner. In this manner, the expense of enforcement is placed on those who violate the law rather than on the taxpaying public.

*Anguiano v. Jim Walter Homes, Inc.,* 561 S.W.2d 249, 254 (Tex.Civ.App.—San Antonio 1978, writ ref'd n. r. e.). *See also Ford Motor Credit Co. v. Blocker,* 558 S.W.2d 493, 498 (Tex.Civ.App.—El Paso 1977, writ ref'd n. r. e.). The penalties imposed by the Code can indeed be harsh in relation to the damage caused the consumer as a result of any particular violation, but that harshness is an intended part of the enforcement scheme envisioned by the legislature.[16]

### III. CONCLUSION

Since Metro's contract with the LaPetinas for an excessive time-price differential was not the result of a "bona fide error" within the meaning of article 5069–8.01(f), the LaPetinas are entitled to the statutory penalty prescribed by article 5069–8.01(a). We need not consider the LaPetinas' alternative claims under articles 5069–7.02(4) and 7.05(1)(b), for a single violation of the Code is sufficient to trigger a penalty under the Code. *E. g., Zapata v. Ford Motor Credit Co., supra,* at 199. We therefore reverse the judgment of the district court. Article 5069–8.01(a) entitles the LaPetinas to twice the time-price differential contracted for and to "reasonable attorneys'

fees fixed by the court." We remand this case to the district court so that it may determine such fees and enter judgment consistent with this opinion.

REVERSED and REMANDED.

---

**16.** In this case the penalty seems particularly harsh, for it follows from the creditor's mere *contracting for* an excessive time-price differential; the creditor neither charged nor received any excessive amount. This result was nevertheless clearly intended by the legislature, for the conditions precedent to recovery ("con-

tracting for, charging or receiving" an excessive rate) are described by the statute in the disjunctive. *See Windhorst v. Adcock Pipe & Supply,* 547 S.W.2d 260 (Tex.1977) (discussing identical conditions precedent in usury statute, article 5069–1.06).