FLORIDA STEEL CORPORATION,
Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent,

United Steelworkers of America,
AFL–CIO, Intervenor.

No. 82–2005.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 25, 1983.
Decided July 29, 1983.

Carl L. Taylor, Washington, D.C., with whom John C. Smith and William R. McKibbon, Jr., Greenville, S.C., were on the brief for petitioner.

Jolane A. Findley, Atty., N.L.R.B., Washington, D.C., with whom Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., were on brief for respondent. William Bernstein, Atty., N.L.R.B., Washington, D.C., also entered an appearance for respondent.

Robert S. Sarason, College Park, Ga., was on brief for intervenor.

Before ROBINSON, Chief Judge, WILKEY, Circuit Judge, and MARKEY,[*] Chief Judge of the United States Court of Appeals for the Federal Circuit.

Opinion for the court filed by Chief Judge MARKEY.

MARKEY, Chief Judge:

Petition for review and application for enforcement of an order of the National Labor Relations Board (board). We refuse enforcement of access and certain publication portions of the order, order enforcement of the remainder, and remand for revision of a Notice and a provision for its posting.

## BACKGROUND

### A. *The Violation*

United Steelworkers Union (Union) started an organizing campaign at the Indiantown plant of Florida Steel Corporation (FSC) in September 1973. An election was held in November, 1973. Union lost. In May, 1974, the board sustained Union's election objections, and held a rerun election. Union won. FSC filed objections. On June 13, 1975, the board rejected those objections and certified Union. The events which gave rise to the present proceeding occurred after the May 1974 election and before Union certification; *i.e.,* while FSC's election objections were pending.

In January 1975, economic factors forced FSC to lay off 55 of the 150 employees in the bargaining unit, causing senior employees to "bump" into lower paying positions and into positions vacated by laid off employees. These operational changes, layoffs, and displacements were implemented in accord with established policies and procedures and were nowhere challenged.

In April 1975, FSC recalled twenty-four laid off employees, again in accord with established and unchallenged procedures. With the plant still operating at a reduced level, many employees returned to job classifications and rates of pay different from those from which they had been laid off.

After the June, 1975 board certification, FSC and Union began bargaining sessions. In the first session, Union asked FSC to explain why it had recalled some employees at lower rates of pay. When FSC gave its explanations at the next bargaining session, Union made no attempt to bargain on the matter. Instead, on July 31, 1975, it filed a charge that FSC recalled ten employees to original jobs at different rates of pay, that it thereby made unilateral wage changes, and that it did so to retaliate against employees for union activity. The General Counsel and the Office of Appeals both dismissed the retaliation charge as groundless, the Office pointing out that supporters and nonsupporters of Union were treated the same and that at least one Union supporter got a wage increase. The General Counsel issued a complaint charging violation of Sections 8(a)(1) and (5) of the National Labor Relations Act (Act). The complaint contained no allegation of antiunion animus.

---

[*] Sitting by designation pursuant to 28 U.S.C. § 293(a).

## B. *Proceedings*

At the initial hearing, the Administrative Law Judge (ALJ) recommended dismissal because the charge had not been timely filed. He concluded that only two of the ten employees, *i.e.,* A.F. McCammon and B.W. McDonald, might have been recalled to perform the same duties at different pay.

The Administrative Law Judge (ALJ) supplied a never-challenged description of the situation respecting McCammon and McDonald:

> . F. McCammon was classified and was paid, at her layoff, as a billet yard helper at $3.80 and was recalled as a yard helper at $3.50; she became a ladle tender in July at $4.50 and in August at $4.70, a yard helper in January 1976 at $3.50, and a ladle tender later in January 1976 at $4.70 and in August 1976 at $5.16.

> W. McDonald was classified and was paid, at his layoff, as a billet yard helper at $3.80 and was recalled as a yard helper at $3.50; he was a tundish repairer in July at $3.60 and later in July at $4, a yard helper in January 1976 at $3.50, a tundish repairer later in January 1976 at $4, and is a slide gate assembler in April 1976 at $4.

As shown above, McCammon and McDonald were classified and paid $3.80 an hour as billet yard helpers at the time of their layoff, and were recalled as yard helpers at $3.50. These were the established rates for these classifications. Before the events under consideration here, Respondent had employed individuals to perform work within the yard helper classification but, for "recruiting" purposes, it had classified these individuals as billet yard helpers and paid them the higher rate of that classification. For this reason Respondent had no employees classi-

fied as yard helpers when it made the layoffs; as indicated, however, it did have employees (McCammon and McDonald among them) classified as billet yard helpers who were actually performing yard helper functions. With the change in economic and employment circumstances, as indicated by the operations cutback and layoffs, Respondent decided to place in a yard helper classification and at the yard helper rate those employees classified as billet yard helpers who were actually doing the work of the yard helper classifications, and it implemented this decision contemporaneously with the layoffs. The record thus shows in this connection that, effective January 26, at least four employees within the bargaining unit bumped into the yard helper classification at $3.50.

The Union was certified on June 13, 1975, as stated above, and it had its first negotiating meeting with Respondent on July 28, 1975. At that meeting the Union inquired generally concerning the fact that some employees were recalled at rates different from their layoff rates. At their next bargaining session, the Respondent, apparently speaking of the McCammon-McDonald situation, explained the matter of misclassification as set forth above. The General Counsel does not contend that Respondent thereafter refused a union request to discuss or otherwise to take up the matter. So far as the record indicates, the Union said no more about the matter of recall wages and classifications and it did not again raise the matter with Respondent, either in contract negotiations or by a grievance route. The Union apparently had something else in mind, for on July 31, 1975, it filed the charge in this case.[1]

---

**1.** One need not condone violations of the Act by FSC to note that the history of FSC-Union relations, like history in general, has not been totally one sided:

> "The record shows that the Union has waged an aggressive campaign for many years in filing as many charges as possible against the Company. Obviously, this has been a part of its strategy to build up a long

history of anti-union activity on the part of the Company to discredit it before the Board. The strategy worked well in this case, as the Board repeatedly referred to the history of charges filed by the Union against the Company. However, the record shows, and the General Counsel admitted at oral argument, that dozens of charges had been filed by the Union and many of them, but not all, had

On appeal, the Board found the charges timely, and went on to find that FSC unilaterally changed the wages of McCammon and McDonald in violation of Sections 8(a)(1) and 8(a)(5) of the Act. It remanded for further evidence on the post-recall work of seven other employees.

After a hearing on remand, the ALJ adopted the board's finding on McCammon and McDonald, but dismissed the complaint respecting the other employees. The ALJ recommended conventional remedies[2] and specifically rejected requests by Union and the General Counsel for extraordinary remedies:

> I nevertheless believe it would be an abuse of discretion to grant the extraordinary remedial requests in the circumstances of this case. The violation found by the Board was an isolated one and hardly egregious in the context of the total layoffs and recalls, and as stated in the original Decision herein, was not accompanied by even an allegation of animus.

The board issued a supplemental decision greatly expanding the ALJ's recommended remedies and making them applicable to FSC corporatewide. Citing only FSC's "pattern of unlawful conduct in recent years" and saying that extra remedial relief is necessitated by Respondent's proclivity to disregard the statutory rights of its employees and their chosen representative", the board ordered FSC to (1) cease and desist its unlawful conduct on a corporate-wide basis; (2) make McCammon and McDonald whole; (3) post a notice at all corporate facilities; (4) mail the notice to every employee; (5) include the notice in appropriate FSC publications; (6) read the notice to all employees; (7) afford two Union representatives access for thirty-minute speeches if an election is scheduled at any FSC plant within two years; and (8) afford Union an opportunity to be present at and to respond to any speech given by FSC at any plant concerning union representation within the next two years.[3] 244 N.L.R.B. No. 61 at 2–3.

The case came here on petitions for review and the board's cross-application for enforcement. Only the remedial aspects of the order were in issue.[4] The Court refused to enforce the broad remedies imposed by the board, and, on February 25, 1981, remanded the case to the board to reconsider the nature of the remedies to be imposed. *United Steelworkers of America v. NLRB*, 646 F.2d 616 (D.C.Cir.1981).[5]

---

been dismissed." *Florida Steel Corp. v. NLRB*, 587 F.2d 735, 743 (5th Cir.1979). The court referred at another point to the Union's "usual practice of filing charges and complaints on practically everything the Company did that had any effect, real or imaginary, on its employees." 587 F.2d at 749 n. 8.

2. Under the ALJ's recommended order, FSC would have been required: (i) to cease and desist from making unilateral changes in pay rates, from refusing to bargain, and from otherwise interfering with its Indiantown employees in the exercise of their rights under the Act; (ii) to pay back wages of about $150 each to McCammon and McDonald; and (iii) to post a standard board notice at the Indiantown plant.

3. The order is attached as an appendix hereto.

4. Union joined the petition for review, maintaining then and now as intervenor that FSC's history of violations requires remedies (bulletin-board privileges and names and addresses of employees at other plants) in addition to those ordered by the board. We reject that view as unsupported by the record.

5. In a 23-page opinion, 646 F.2d 618–642, the court: discussed in detail FSC's earlier cases before the board; recognized the deference due the board's expertise; reviewed the law on access stemming from *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 76 S.Ct. 679, 100 L.Ed. 975 (1956); held that access could be ordered as a remedial measure without the *Babcock*-required proof that other means of communication are not available; reviewed general remedial principles, the use of access as remedy, access to bulletin boards, plant access for organizers, and access at the plant where the violation occurred and at other plants; set forth standards for application of access as a remedial measure; and remanded the case for application of those standards. That access to other plants may be granted as a remedial measure must, therefore, be accepted as the law of the case. That such access is permissible only when the prescribed standards have been met must equally be accepted as the law of the case.

## C. *This Court's Remand*

This court remanded "for further proceedings consistent with this opinion." 646 F.2d 642. In so doing, the court said it did not suggest that the board act less aggressively but did require that it act "more deliberately". 646 F.2d at 641, 642.

In Section IV of the court's opinion, headed "The Appropriate Standards to be Applied in Cases Involving 'Union Access' as a Remedial Measure", the court said:

> Given the amount at stake in this setting, however, a *conclusory statement* by the Board that access is needed to neutralize effects is not sufficient to justify a grant of access. *Assumptions must be supported by evidence in the record.* The *seriousness* of the *violations at issue* must be *weighed.* Where access is awarded beyond the locations at which unfair labor practices are found, the *extent to which employees located in other plants know, or have reason to know, of unlawful conduct must be considered.* The *distance between the employer's operations may be relevant.* The *presence or absence of union activity at various company locations is an important factor* that should be considered.[44] In the case of a recidivist violator, the *effect of the passage of time between violations must be evaluated.*[45] In short, we hold that the Board must find that it is reasonably foreseeable that the employees at those plants where access is imposed have suffered coercive effects from the employer's unlawful conduct and that *an access remedy is necessary to cure those effects.* [Emphasis added; footnote 44 omitted].

[45] *Too often the Board has invoked a history of past violations as justification in itself for extraordinary access remedies.* It is not a history of unlawful conduct that justifies access as a remedial measure, but rather it is the effects that such a history may produce. The Board must demonstrate, through evidence and carefully articulated presumptions, that such effects have occurred or are likely to occur. In doing so, the Board must consider, for example, the *seriousness of the violations* involved, the *amount of time between violations, and the extent to which employees know or may have reason to know of past incidents of unlawful conduct.* We do not suggest that

the Board has failed in all cases to consider these factors. For instance, in *Wolverine World Wide, Inc.,* 243 N.L.R.B. No. 72 (July 12, 1979), the Board held that three instances of misconduct committed during a period of time of six to fourteen years were too remote in time from the instant proceeding to support a finding that the employer had a proclivity to violate the Act.

646 F.2d 616 at 639.

In Section V of the court's opinion, headed "The Disposition of This Proceeding", the court said:

> We are unable, however, to enforce the order of the Board. The Board has *failed to make the findings described above* that these corporatewide remedies are necessary to offset coercive or chilling *effects caused by the employer conduct at issue,* even as that conduct is magnified by the existence of previous violations of the Act. The Board has not demonstrated that it is reasonably foreseeable that *such effects* have been produced on a corporatewide basis.

The Administrative Law Judge in this action found that the violation at issue here could be remedied adequately through the use of traditional cease and desist and affirmative remedial orders. The Board disagreed, and concluded that "extra remedial relief is necessitated by Respondent's proclivity to disregard the statutory rights of its employees and their chosen bargaining representatives." 244 N.L.R.B. No. 61 at 2 (Aug. 20, 1979). The Board supported this conclusion by reference to "reasons fully explicated" in an earlier Florida Steel case, 242 N.L.R.B. No. 195 (June 20, 1979). The Board also noted that the present action was not the initial transgression of employee rights at the Florida Steel plant involved; the Board cited an earlier case in which the Board had found that Florida Steel violated the Act at the Indiantown plant by withholding a wage increase in retaliation for union activities of the employees. The Board made *no findings* in this case concerning *effects* caused by *the unlawful employer conduct,* either at the immediate plant involved or at any other facility of Florida Steel.

In the earlier decision relied upon by the Board, 242 N.L.R.B. No. 195, the Board reviewed at length "the repetitive and flagrant nature" of violations of the Act by Florida Steel. 242 N.L.R.B. No. 195 at 2. The Board stated in that case that extraordinary remedies were needed "to fully remedy Respondent's rejection of the principles of collective bargaining as evidenced by its pattern of unlawful conduct in recent years." *Id.* The Board also found that "[t]he instant violation is yet another step in what can only be characterized as a corporate campaign to chill employee organizational activity throughout its facilities through unlawful conduct." *Id.* at 4. The only statement made by the Board concerning the effects produced by this unlawful campaign, however, was a conclusory assertion in a footnote that extraordinary remedies were "essential to neutralize the effects of Respondent's continuing pattern of unlawful conduct in recent years." *Id.* at 5 n. 10.

*These statements are insufficient* to substantiate the conclusion that corporatewide access is needed to offset coercive or chilling effects produced corporatewide by the unlawful conduct of Florida Steel. We are no less disturbed than the Board by the extensive history of unlawful conduct of this employer. *However, that history alone cannot justify the relief ordered in this case.* We have already noted the factors that the Board must weigh before granting union access as a remedial measure. *We repeat, for emphasis,* that with respect to locations other than the plant where the unfair labor practice has occurred, the Board must find that it is reasonably foreseeable that the *employees at these locations have suffered coercive effects* from the employer's unlawful conduct and that an *access remedy is necessary to cure those effects.* Absent these findings, the *Board order* at issue here *cannot be justified as remedial* action, and *can only be explained as containing punitive*

*measures* designed to *deter future violations* of the Act.

There is evidence in two earlier Florida Steel proceedings that the company used statutory violations committed at one plant as a "warning" to employees at another plant.[46] On our examination of the record, however, no such evidence has been uncovered since 1977. Moreover, there appears to be no evidence that the company has ever publicized its unlawful conduct corporatewide, or indeed at any of the plants at which there has not yet been union activity. We simply cannot assume from the evidence in this record that the conduct of Florida Steel has had a corporatewide chilling effect upon employees. Given the critical need for coercive effects to be present before access is awarded at the unorganized plants of Florida Steel, we are unable at this time to enforce the order of the Board. [*Emphasis added; footnote omitted.*]

646 F.2d 640, 641.

### The Board's Action on Remand

On April 22, 1981, the board notified the parties that they could file statements of position and delegated its authority to a three-member panel, two members of which had served on the panel that issued the original order.

Based on what it described as a review of "the entire case in light of the court's decision, the statements of position on remand, the response brief and the motion,"[6] the board issued an order virtually identical with its previous order. 262 N.L.R.B. No. 102.

The sole difference in the two orders is a change from "at any of Respondent's plants" to "at Respondent's Tampa or Jacksonville plant" in paragraphs 2(d) and 2(e) of the original order. (See Appendix) (summarized at (7) and (8) above).

In its Second Supplemental Decision and Order, the board noted that "Union now limits its request for access to Respondent's

**6.** Union moved that the board take notice of *Florida Steel Corporation v. NLRB,* 648 F.2d 233 (5th Cir.1981). The board granted the motion.

Tampa and Jacksonville, Florida, facilities", adding ". . . . we believe that Union access to the Tampa and Jacksonville facilities is appropriate. In all other respects, we adopt our previous order." 262 N.L.R.B. No. 102 at 6–7.

## OPINION

The board said it "accepted the court's remand", that it "reviewed the case in the light of the court's decision", and that it had "accepted the court's decision as the law of the case". In light of those statements, it would appear that this court's opinion somehow failed in its effort to guide, for it managed to get itself misread, misconstrued, misunderstood, and misapplied.[7]

Because they rest in reliance on conclusory statements and assumptions, and on an invocation of history with no link to any effect reasonably expected from the violation in this case, the board's action and order do not respond to this court's guidance on remand and cannot be upheld.

## HISTORY

As above indicated, this court said FSC's extensive history of unlawful conduct "alone cannot justify the relief ordered in this case." Though the board at one point said it was "mindful" of that admonition, it discusses at length that very history on virtually every page of its decision and brief before us. It does so to the exclusion of and in substitution for the factual findings required by this court respecting effects of the violation at issue, effects of the history itself, and the need for access to remedy those effects.

Indeed, the board employs FSC's history as an all-purpose weapon, using it to explain its conclusory statements on each of the five inquiry areas on which fact findings were required by this court. Whatever may be said of this court's opinion accompanying its remand, it must be perceived as establishing that history is not a substitute for evidence.

In requiring that the board support its relentless reach for an access remedy in this case by evidence in the record, this court was careful to require findings that access is necessary to offset effects "caused by the employer conduct at issue." 646 F.2d at 640. In so doing, this court joined other courts in insisting that the board impose a remedy proportionate to the violation at hand and its effects. Effects of the conduct at issue, if established by evidence of record, may be evaluated in light of history. Absent those effects, the void cannot be filled by mere historical recitations. History cannot exacerbate what does not exist. *Florida Steel Corp. v. NLRB,* 587 F.2d 735, 744 (5th Cir.1979) ("An unlawful motivation in the discharge of an employee cannot be based solely on the general bias or anti-union attitude of the employer, whether proved or conceded, but must be established by other facts in each individual case."); *Florida Steel Corp. v. NLRB,* 601 F.2d 125, 132 (4th Cir.1979) ("The crucial flaw in the Board's conclusion is a total absence of a causal connection between the firing and anti-union animus. Without such a connection, evidence that . . . the company had a general anti-union bias is of no avail.");

---

**7.** As but one example, the board says "the court distinguished between access for organizational purposes and access as a remedy to *deter* employer interference with employee rights" and says in those "latter circumstances" access *may be* ordered as remedy. 262 N.L.R.B. No. 102 at 4. [*Emphasis added.*] What this court said was directly contrary. The court *equated* access-to-deter with access violative of *Babcock* principles. The court specifically and *repeatedly* limited remedial access to those instances in which it was found on the record necessary to *undo effects* of the violation at issue, as appears in the board's quote from the court's opinion following its false distinction quoted above. Indeed, the court carefully pointed out that "access is ordered to remedy the effects of unlawful behavior and *not to* punish or *deter* an employer" [*Emphasis added.*] 646 F.2d at 638. The court stated clearly that absent *findings* on *effects* and the necessity for access to *cure* those effects, the board's order under review could not be justified as remedial, but could "only be explained as containing punitive measures designed to *deter* future violations of the Act." [Emphasis added] 646 F.2d at 641.

*Florida Steel Corp. v. NLRB,* 648 F.2d 233, 240 n. 21 (5th Cir.1981) ("The remedy formulated, while not blind to the history of the company's union relations, must be proportionate to the illegal conduct at hand.").

In its decision accompanying the present order, the board merely repackaged its earlier discussion of FSC history. That action was not, as this court required, "consistent with this opinion". 646 F.2d at 642. As above indicated, this court required that the board consider and make findings on:

(1) the seriousness of the violation at issue

(2) knowledge of this violation at other plants

(3) distance between this plant and other plants

(4) existence of union organizing activity at other plants

(5) the effect of the passage of time between violations.

■ The board referred to each factor in its decision, and in its brief (which essentially restates the board's decision). In so doing, however, it pointed to nothing in the record of the violation at issue that would support its extraordinary remedy requiring corporatewide notification and access to plants at Tampa and Jacksonville. History is used here to increase seriousness of the violation, to justify an assumption of knowledge, to overcome distance, to render union organizing irrelevant, and to disregard passage of time. Relying totally on historical events wholly unrelated to the violation at issue, the board erred in failing to identify even minimal support in the record for its order under the explicit standards set forth by this court.

As history alone could not justify the board's original order, history alone cannot justify the virtually identical order substituted by the board.[8]

*(1) Seriousness of the Violation at Issue*

In its first Decision, the board described the present violation as one that "would not, under ordinary circumstances, appear to justify extraordinary remedies." As above indicated, the ALJ described the violation as "isolated", "hardly egregious", and "not accompanied by even an allegation of animus." The board's brief here admits that the "relative gravity of the violation" is a factor that "may weigh against the imposition of an access remedy."

Discussing this factor in its Decision accompanying its present order, the board began with a statement that by-passing a union is not a deminimus violation, then quoted its earlier description of the present violation as one that would not ordinarily justify extraordinary remedies. It followed that quote immediately with, "This violation, however, must be evaluated in the context of Respondent's earlier conduct, which we now examine." 262 N.L.R.B. No. 102 at 7. The board then launched into a description of earlier violations at various FSC plants, terminating its two-page discussion of that history with, "In these circumstances, the violation here, although minor in scope, looms much more serious than it would were it standing alone." The board footnoted this last statement with, "We are sensitive to the court's admonition regarding the invocation of a history of past violations as justification for extraordinary remedies. We believe the above analysis carefully takes into account the criteria articulated by the court in its decision, and the concern expressed therein." 262 N.L.R.B. No. 102 at 9.

In the two pages devoted to this factor by the board, there appears not a single refer-

---

**8.** In seizing upon remarks of this court in which it carved out an exception to the rule of *Babcock and Wilcox v. NLRB, supra,* n. 5, the board has apparently overlooked the narrowness of that exception. In its opinion on remand, the court twice set forth the specific burden the board must meet before imposing a remedy impinging upon an employer's property rights. The court repeats here, for the third time, that the board must cite evidence that the violation at issue produced coercive effects at the plant to which access is ordered, and that access is necessary and essential, not merely useful or effective, to undo these effects. To aid the board, the court discusses, *infra,* the board's treatment here of the five guideline factors that must be applied before the principles of *Babcock* may be set aside.

ence to evidence in the record supporting the statement that history causes the violation at issue to loom more serious, or that this violation had *any* effects, at Indiantown or elsewhere. There is no reference, of course, to any evidence of what those effects were. Nor is there a single reference to anything in the record that would indicate a need for access to remedy any effects of the violation at issue.

Nowhere does the board acknowledge or even mention the absence of antiunion animus in the violation at issue.[9] Nor does the board mention, let alone refute, FSC's characterization of the violation as simply a mistake and inadvertence in the midst of a complex layoff and recall. Nor does the board mention or deny FSC's contention that there were *no* effects at all stemming from the violation at issue. Nor does the board recognize or dispute the ALJ's characterization of the violation as isolated and non-egregious. Nor does it mention the ALJ's characterization of extraordinary remedies here as "an abuse of discretion". Nor does it say why the ALJ's recommended order would not adequately remedy the effects, if any, of this violation. Content with a recitation of history alone, the board simply remained silent respecting its view on any of these evaluative elements.

An "analysis" devoted entirely to a recitation of history can hardly be described or accepted as one that "carefully takes into account the criteria articulated" by this court. Nor can such an "analysis" be considered remotely responsive to the "concern" expressed by this court in its opinion accompanying remand that "history alone cannot justify the relief ordered in this case." On the contrary, the board's "analysis" forces the reluctant conclusion that sight was somehow lost of the guidance offered by this court respecting the need to determine on the record the seriousness of

the violation at issue, its effects, and the need for access to remedy those effects.

We need not determine under what circumstances, if any, history might convert a minor violation devoid of antiunion animus and having no effects on employee rights into a serious violation. It is enough to note that no such circumstances are of record here. As clearly foretold in this court's opinion on remand, a serious violation with coercive effects elsewhere might warrant an access remedy. There was little point, however, in the court's requiring an evaluation of the seriousness of the violation at issue if history is to control regardless of how serious or non-serious the violation was.

The board, in electing to supply only a discussion of history, erred in failing to meet the requirement of this court for a determination of the seriousness of the violation at issue, the effects of that violation, and the need for access to remedy those effects.

### (2) Knowledge of This Violation at Other Plants

The board again relies entirely on history, beginning its discussion of this factor with "The evidence in cases involving this Respondent convinces us that employees in other plants know, or have reason to know, of Florida Steel's unlawful conduct." 262 N.L.R.B. No. 102 at 9. Concentrating thus on conduct generally, the board says nothing specifically directed to knowledge of the conduct at issue, and cites no evidence whatever that employees learned of *this* violation. Instead, it reviews at length the same history, since 1974, of FSC violations that it cited in support of its earlier order and that this court discussed and found inadequate to support an access remedy. The board then added an extended discussion of one more event in that history, *i.e.,* the 1976 distribution of a videotape described in the case added to the record on Un-

---

**9.** The board repeatedly folds the violation at issue into FSC's "pattern" of violations involving antiunion animus. Its brief erroneously refers to the present violation as one under § 8(a)(3), and says it was "designed to undercut the Union's status". The violation at issue, however, as the record shows, was "isolated" and deviated sharply from those involving antiunion animus. This court said history alone will not justify access. 646 F.2d at 641. It would seem clear that distorted history alone offers even less justification.

ion's motion, *Florida Steel Corporation v. NLRB,* 648 F.2d 233 (5th Cir.1981). 262 N.L.R.B. No. 102 at 11–13. Calling this a "recent" violation, the board said the offending tape portion was not excised until 1978 and draws an inference that the unlawful conduct there found continued into 1979.[10] The board noted that the videotape was intended for corporatewide distribution, and that Tampa employees had been told in 1974 to watch and see what happens in Indiantown. It nowhere recognizes that those at Jacksonville, to which access was ordered, were not so told. It does not mention that the videotape contained no reference, express or implied, to the violation at issue. The board, however, stated broadly that it assumed that "knowledge of unfair labor practices" would be learned "by employees" and that "Respondent's own actions give rise to the assumption that they have had a chilling effect on employees companywide."

In the board's discussion of this factor, the *sole* specific reference to the violation at issue (referred to by the board as "the Indiantown violations") appears in its two-sentence refusal to accept FSC's assertion that knowledge of that violation was never communicated, orally or in any FSC publication, to any employees at Indiantown or elsewhere. The board's refusal was, in turn, based solely on an assumption drawn solely from history. As set forth in this court's extensive opinion on remand, assumptions based on history alone cannot serve to support access remedies.

This court referred to three possible pathways for plant-to-plant travel of knowledge: the employer, media, and employee-to-employee contact. The board mentioned none of these in respect of the violation at

issue, but simply assumed from history that news of it had been spread.[11]

In considering this factor, the board erred in relying solely on history-based assumptions that are not, as this court required, "supported by evidence in the record." 646 F.2d at 639.

*Distance Between This and Other Plants*

The board dispenses with this factor in one paragraph, in which it admits that Indiantown is "relatively isolated", but then says it could not agree with FSC's assertion that employees at other plants are likely to be unaware of and unaffected by the violation at issue. As the sole reason for its disagreement, the board says "For the relevant history reveals, as developed above, that Respondent has specifically directed its employees' attention to events at Indiantown." 262 N.L.R.B. No. 102 at 14. In support of that view, the board cited the same earlier board case, 231 N.L.R.B. 923, rejected by this court in its discussion of past company warnings. 646 F.2d at 641.

In its brief here, the board admitted that the geographical isolation of the Indiantown plant "may weigh against the imposition of an access remedy." Nothing in the board's decision on remand indicates the contrary.

The board nowhere discusses the influence, if any, of distance on the basic inquiry required by this court, i.e., whether it is reasonable to conclude that employees at other plants suffered coercive effects from the violation at issue and whether an access remedy is needed to cure those effects. 646 F.2d at 638, 639, 640, 641. Indeed the board nowhere mentions effects or the need for access to remedy them. The board simply

10. The board sought to impose an access remedy in the videotape case, citing the history of FSC violations. Though finding FSC in civil contempt, the court refused to enforce the board's access order, saying "The remedy formulated, while not blind to the history of the company's union relations, must be proportionate to the illegal conduct at hand." 648 F.2d at 240 n. 21. The board is attempting to use the present admittedly minor 1975 violation unaccompanied by antiunion animus as a basis for an access remedy it was denied in a case in-

volving a much more serious and antiunion violation that occurred in 1976.

11. The board's assumption is premised on what it calls FSC's "proclivity" for chilling employees' exercise of their rights by conveying its antiunion animus to them. It never explains why, if that premise be valid, FSC would want to convey information about the violation at issue which contained no antiunion animus.

made an assumption based on history of conduct wholly independent of and unrelated to the violation at issue, and disregarded evidence undermining that assumption. In so doing, the board appears to have lost sight of the guidance supplied by this court in its statement that the distance between an employer's operations may be relevant, and thereby erred in its consideration of this factor.

### Existence of Union Organizing at Other Plants [12]

The board nowhere challenges the *fact* alleged by FSC that there has been *no* union organizing activity at Tampa or Jacksonville since 1976. Instead, it repeats its concentration on history, from which it draws two assumptions: (1) that *if* a union were to undertake an organizational campaign at those plants, employees there would remember "Respondent's previous unlawful course of conduct"; and (2) "This pattern teaches that if the Union were to begin anew organizational activity at any plant, the Company would respond as it has in the past". 262 N.L.R.B. No. 102 at 16–17.

The board again ignores this court's requirement for articulation of effects, in light of this factor, and nowhere articulates why in its view the *non*-existence of Union activity does not make it less likely that employees at other plants would have suffered coercive effects from the violation at issue. Nor does the board discuss at all, as required by this court, the need for access to remedy effects of the violation at issue in light of this factor.

The board's total concentration on history effectively rendered this factor irrelevant. On this record *no* union organizing has existed at other plants, yet the board sees that fact as irrelevant in the light of history. If there *were* union organizing activity at other plants that could have been effected by the violation at issue, the board would presumably have asserted a stronger case for

its access remedy. If FSC's history alone warrants access to plants where there has been no union organizing activity as well as to plants where there has been such activity this court's requirement for consideration of this factor becomes a nullity. The board erred in failing to consider the evidence that no union activity existed at other plants and the influence of that evidence on whether there were at those other plants coercive effects of the violation at issue and on a need for access to remedy those effects at those other plants.

### Effect of Passage of Time Between Violations

The board, in discussing this factor, stated that the violation here at issue "came at a time when [Respondent] was committing various other unfair labor practices," and that "[i]n such circumstances, we presume that such an unfair labor practice will have a greater impact than it otherwise might have had, and that its effect will linger beyond the time it normally would." 262 N.L.R.B. No. 102 at 16. The Board articulated no basis for this presumption in the context of the conduct at issue. That Tampa employees were told, nine years ago, to watch what happened at Indiantown was again emphasized by the board. It cited no effects upon Tampa employees stemming from the violation at issue, and no facts of record tending to make such effects likely.

The record here is unchanged (except for addition of *Florida Steel Corp. v. N.L.R.B.*, 648 F.2d 233 (5th Cir.1981)) from that before this court when it originally considered this case. That record included FSC's statements at Tampa and their relationship in time to the present violation. It included a recognition that other violations occurred at about the time of the violation at issue. The board has added nothing to the factual record respecting effects of the violation at issue. Nor does the board articulate why, if there were such effects, the passage of time

---

**12.** The board treated together this factor and the next, "Passage of Time Between Violations". They are, however, distinct inquiries subject to distinct findings. Each should be treated on their merits and relevance in a particular case. We have separated, to the extent possible, the comments of the board respecting the two factors.

has not in its view vitiated those effects. Nor does it respond to FSC's assertion that remedial measures ordered by the board in earlier cases had, in conjunction with passage of years, vitiated any effects not only of this violation but of those included in the board's history discussion.

Indeed, the Board nowhere explains how timing can magnify effects of the conduct at issue on employees beyond Indiantown if there were no such effects in the first place, or how one may multiply that which does not exist. The Board's presumption that the particular violation at issue must have had a "greater impact" on employees at facilities beyond Indiantown because of its timing is simply not adequately supported. Nor is its assumption that access is necessary because of timing.

The violation at issue occurred in April, 1975. The effect of the passage of more than eight years was dismissed, the Board said, because it "is in large part a function of the legal process," and because FSC distributed its videotape to employees a year after the present violation occurred. 262 N.L.R.B. No. 102 at 16. In *Peoples Gas System, Inc. v. N.L.R.B.*, 629 F.2d 35, 47 (D.C.Cir.1980), this court said, "with the passage of time, any coercive effects of an unfair labor practice may dissipate," and that the passage of time there could "be attributed to the Board and this court." The board does not discuss why in its view the passage of many years (even from the last violation of FSC) has not caused the effects, if any, of the violation at issue to have dissipated by now.

Absent present effects from the violation at issue, the need for an extraordinary access order to remedy those effects evaporates. In *Peoples Gas* this court further said: "the Board should formulate its remedy in light of the violation with which it is faced and the conditions in the bargaining unit at the time it renders its decision . . . . A remedy, by its very nature, must be adjusted to fit the realities of the situation it is expected to resolve." 629 F.2d at 48. The board does not indicate what (other than history) there is at the time of its

decision that would require access as a remedy that would "fit the realities of the situation it is expected to resolve".

A total concentration on history here caused dismissal of "the realities of the situation" out of hand. FSC requested, in discussing the passage of time, that its improved record of labor relations in recent years be considered. The last violation charged against FSC was the videotape distribution in 1976. The board felt that that violation continued into 1978 and (by inference) into 1979. Thus on this record FSC's union relations "history" has been free of even charges for seven years and of known violations for at least four years. In dismissing the request, the board did not deny the *fact* of an improved record, but said, "Respondents arguments concerning . . . its own lack of unlawful conduct strike a hollow note when played against the overwhelming evidence of its continual unlawful responses to union activity", 262 N.L.R.B. No. 102 at 16, and, "We refuse to infer, as Respondent would have us do, that the recent lack of unfair labor practices committed by it indicates an 'improved record' by this recidivist. It is more reasonable to conclude, given Respondent's continual pattern of unlawful behavior, that Respondent's unlawful conduct unnecessary over the last few years. This pattern teaches that if the Union were to begin anew organizational activity, the Company would respond as it has in the past". 262 N.L.R.B. No. 102 at 17.

In its opinion on remand, this court recognized, as it will continue to recognize, and as other courts have recognized, a level of deference due the board's expertise. Applying deference, we need not decide whether the board erred in electing to disregard an improved record of an employer dealing daily with Union at two of its plants (Croft and Indiantown) over at least the last four years. Nor need we comment on lack of evidence that Union has been intimated into silence over that time. Nor need we remark the obvious fact that corporate leadership does change in personnel and policy over time. Nor need we note

that no improved record could survive a conclusion that unlawful activity was unnecessary and a presumption that unlawful activity would be resumed when occasion for it occurred. It is for the board to decide at least initially whether a "mark of Cain" or a "prodigal son" approach is more likely to encourage continuation of an improved labor relations record. It is for the board to decide which approach is best calculated to achieve the purposes of the Act, among which is the achievement of industrial peace.[13]

▮ The board erred in failing to cite evidence in support of its assumption that the passage of time did not here render its access remedy inappropriate.

### Summary On Access

In recognizing that courts will not lightly interfere with the board's fashioning of remedies, this court quoted the statement in *Virginia Electric Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943), that the board's choice must stand "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act". 646 F.2d 629. The record here establishes that the board's present order, like its predecessor, "can only be explained as containing punitive measures designed to defer future violations of the Act", 646 F.2d 641. The present order cannot be viewed, therefore, as one that "can fairly be said to effectuate the policies of the Act".

The board noted this court's statement that it was entitled to consider FSC history of violations of the act in shaping its remedy. It appears to have recognized, however, that this court did not say such "consideration" may form the *sole* basis for an access remedy, for it stated, "In so describing Respondent's past conduct, we are not elevating it to paramount consideration in deciding the appropriate remedy here.

Rather, we are drawing inferences which we believe are reasonable in light of this Respondent's propensity to engage in unlawful conduct, in order to assess properly the corporatewide effect of Respondent's conduct and the need to remedy that conduct on a corporatewide basis. We are not seeking to punish Respondent merely to deter future violations. We are of the opinion, however, that it is reasonably foreseeable that employees working for Respondent have suffered coercive effects because of Respondent's misconduct, and the history surrounding such misconduct is relevant in ascertaining such effects and the appropriate remedy." 262 N.L.R.B. No. 102 at 17–18.

The difficulty with the present record is the absence of anything *but* past conduct as the "paramount consideration" cited in support of the order. As above indicated, the board points to nothing in the record of the instant violation that would support access at Tampa and Jacksonville. The board's reference to what it believes and to its opinion rest solely on a look at a history of past conduct and what it would like to do about that history. That, as this court said in refusing enforcement of the original order (of which the present order is a virtual duplicate), is insufficient for an access remedy. The record being devoid of all else, the access portions of the order are not supported and cannot be enforced.

### The Notice Provisions

▮ Paragraph 2(b) of the order requires corporatewide mailing, posting, and publication of the Notice accompanying the order. Paragraph 2(c) requires a corporatewide reading of the Notice to all employees by a responsible FSC official. The Notice includes references to the corporatewide notice and access to Tampa and Jacksonville provisions of the order. There is nothing of record indicating any reason to publicize corporatewide the concededly minor, insub-

---

**13.** We do suggest, in accord with the requirement set forth in this court's opinion on remand that the board act "more deliberately", that it spell out, at an early opportunity, a set of factual criteria applicable to consideration and non-consideration of improved labor relations records.

stantial violation at issue here. Paragraphs 2(b) and 2(c) are as much without support in the record as are paragraphs 2(d) and 2(e), and must, therefore, fall with the latter.

### CONCLUSION

Accordingly, enforcement is ordered of paragraphs 1(a), 1(b), 2(a), and 2(f) of the board's order. Enforcement is refused of paragraphs 2(b), 2(c), 2(d), and 2(e) of the board's order.

Because the corporatewide nature of paragraph 2(b)'s mailing, posting, and publication requirements, and the presence of access provisions in the Notice, are without support in the record, judicial enforcement of paragraph 2(b) is precluded. FSC's brief includes an expression of willingness to accept the posting and publication provisions. The board may wish to enter a revised paragraph 2(b) to require appropriate dissemination of a revised Notice to FSC's Indiantown employees. For that purpose, the case is remanded to the board.

Enforcement of the board's order is ordered in part and refused in part, and the case is remanded for appropriate revision of paragraph 2(b) and the Notice to which it relates.

### APPENDIX

#### The Board's Original Order

##### August 20, 1979

1. Cease and desist from:

(1) Unilaterally changing the pay rates of employees within the bargaining unit represented by United Steelworkers of America at Indiantown, Florida, without first notifying and consulting with United Steelworkers of America.

(b) In any other manner refusing or failing to bargain with the Union or interfering with, restraining, or coercing employees in the exercise of the rights guaranteed them under the Act.

2. Take the following affirmative action:

(a) Make whole A.F. McCammon and B.W. McDonald for losses resulting from unilateral changes in their pay rates upon their recall in 1975.

(b) Mail a copy of the attached notice marked "Appendix."[4] to each and every employee throughout its corporate facilities, post copies at each of its corporate facilities, and include it in appropriate company publications. Copies of said notice, on forms provided by the Regional Director for Region 12, after being duly signed by Respondent's representative, shall be posted by Respondent immediately upon receipt thereof, and be maintained by it for 60 consecutive days thereafter, in conspicuous places, including all places where notices to employees are customarily posted. Reasonable steps shall be taken by Respondent to insure that said notices are not altered, defaced, or covered by any other material.

(c) Convene during working time all employees at each of its plants throughout its corporate facilities, either by shifts or departments, or otherwise, and have a responsible official of Respondent, at department supervisor level or above, read to the assembled employees the contents of the attached appendix.

(d) If, within the next 2 years following entry of this Order, the Board schedules an election in which the Union is a participant at any of Respondent's plants, then, upon request by the Union, afford at least two union representatives reasonable access to Respondent's said plant or plants to deliver a 30-minute speech to employees on working time, the date thereof to be within 10 working days before but not within 48 hours prior to any such election.

(e) In the event that during a period of 2 years following entry of this Order, any supervisor or agent of Respondent convenes any group of employees at any of Respondent's plants and addresses them on the question of union representation, give the Union reasonable notice thereof and afford two union representatives a reasonable opportunity to be present at such speech and, upon request of said representatives, permit one of them to address the employees for

the same amount of time as Respondent's address."