NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CREATIVE FOOD DESIGN LTD., T/A
The Broker, Respondent,

Hotel & Restaurant Employees Local
25, AFL–CIO, Intervenor.

No. 87–1235.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 22, 1988.

Decided July 26, 1988.

Steven B. Goldstein, Atty., N.L.R.B., with whom Aileen A. Armstrong, Deputy Associate Gen. Counsel and Peter Winkler, Atty., N.L.R.B., Washington, D.C., were on the brief for petitioner. Elliott Moore, Office of the Gen. Counsel, N.L.R.B., Washington, D.C., also entered an appearance for petitioner.

Ronald A. Lindsay, with whom Peter Chatilovicz and Robert M. Shea, Washington, D.C., were on the brief for respondent.

Jeffrey Freund and Mady Gilson, Washington, D.C., were on the brief for intervenor, Hotel and Restaurant Employees Local 25, AFL–CIO.

Before ROBINSON, MIKVA and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge MIKVA.

Dissenting opinion filed by Circuit Judge STARR.

MIKVA, Circuit Judge:

The National Labor Relations Board ("Board") seeks enforcement of an unfair labor practice order issued against Creative Food Design, Ltd., t/a The Broker ("company"). The Board ruled that the company's president voluntarily recognized Local 25 of the Hotel and Restaurant Employees International Union ("Union") during the course of a meeting in the summer of 1981. The Board concluded that the company's subsequent refusal to bargain with the Union constituted an unfair labor practice in violation of sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("the NLRA"), 29 U.S.C. §§ 158(a)(1), (a)(5) (1982), and ordered the company to bargain with the Union.

We find that substantial evidence in the record as a whole supports the Board's findings and affirm its holding that the company violated the federal labor laws. We also disagree with the company's claim that the Board erred by failing to consider turnover within the bargaining unit workforce in determining whether to issue a bargaining order. We therefore affirm the Board's bargaining order.

## I.

The company operates a restaurant in Washington, D.C. called The Broker, and a catering service known as Creative Food Design. The company is owned by three individuals, William Homan, Horst Klein, and Stavros Veletsis. Homan, the president of the company, runs the catering service but is also involved in the restaurant's operations. For example, he signs all paychecks, often closes the restaurant at the end of the evening, acts as a host at the restaurant, and participates in hiring of restaurant employees.

Homan was in charge on August 3, 1981, when two union officials arrived shortly before the restaurant opened and requested to speak with him. Ronald Richardson, executive secretary treasurer of the Union, informed Homan that Local 25 represented a majority of the approximately 33 employees of The Broker. Homan responded that The Broker did not have a union. Richardson replied that a majority of the employees had signed union authorization cards.

At this juncture, a critical exchange took place. The evidence, as credited by the Administrative Law Judge ("ALJ"), indicates that Richardson offered to show Homan the signed authorization cards if the latter agreed to recognize the Union upon verification that the cards represented a majority of the employees. Homan assented and took the cards. According to the (conflicting) testimony of those present, Homan then either "went through the cards one by one, very slowly," Joint Appendix ("J.A.") at 64, examined each card and placed it on the bottom of the stack "through [all of] the cards," J.A. at 78, looked at the first few cards and "fanned through the remainder," J.A. at 95, or examined them "like shuffling a deck." J.A. at 123. Homan testified that he only "glanced at the top card." J.A. at 32.

Homan then acknowledged that the signatories appeared to represent a majority of The Broker's employees. See J.A. at 64, 78, 95–96. Richardson then requested that Homan sign a recognition agreement. Homan replied that he had no problem with the agreement, but that he would have to consult with his partners before signing. See J.A. at 78. The union men gave Homan photocopies of the cards and a list of employees who had signed, and Homan agreed to get back to the Union in a few days.

Soon thereafter, Homan and Richardson exchanged letters in which Richardson sought to hold Homan to the Union's view that Homan had recognized Local 25. Homan insisted that he had never agreed to recognize the Union. On August 17, the company filed a petition with the Board's Regional Office seeking an election to determine whether Local 25 enjoyed majority support at The Broker.

The Union then filed charges that the company had committed an unfair labor practice by refusing to bargain, and the Board's Regional Office issued a complaint. After a two day hearing in May 1982, the ALJ decided that Homan had in fact recognized the Union during his August 1981 conversation with Richardson and that the company's subsequent refusal to bargain violated the NLRA.

The company filed exceptions to the decision. In February 1987, the Board issued its order and decision affirming the ALJ's findings that the company, through Homan, voluntarily recognized the Union and thereafter unlawfully withdrew recognition. The Board ordered the company to bargain with Local 25.

## II.

█ Well-established principles govern our review of this case. First, the Board's findings of fact are conclusive if supported by substantial evidence. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). We must accept the ALJ's credibility determinations, as adopted by the Board, unless they are patently insupportable. *See Conair Corp. v. NLRB*, 721 F.2d 1355 (D.C.Cir.1983), *cert. denied sub nom., Local 222, ILGWU, AFL–CIO v. NLRB*, 467 U.S. 1241, 104 S.Ct. 3511, 82 L.Ed.2d 819 (1984). Thus, the company bears a heavy burden in seeking to overturn the Board's decision.

█ Second, the law governing voluntary recognition of unions is clear. The employer is not required to recognize a union on the basis of a majority card showing and has the option to insist on an election. *See Linden Lumber v. NLRB*, 419 U.S. 301, 95 S.Ct. 429, 42 L.Ed.2d 465

(1974). However, once the employer recognizes the Union—"no matter how informally," *NLRB v. Lyon and Ryan Ford*, 647 F.2d 745, 750 (7th Cir.), *cert. denied*, 454 U.S. 894, 102 S.Ct. 391, 70 L.Ed.2d 209 (1981)—the employer is bound by that recognition and may no longer seek an election. *Id.; see also Jerr–Dan Corp.*, 237 N.L.R.B. 302, 303 (1978), *enf'd*, 601 F.2d 575 (3d Cir.1979); *NLRB v. Brown and Connolly*, 593 F.2d 1373, 1374 (1st Cir.1979); *Georgetown Hotel v. NLRB*, 835 F.2d 1467, 1470–71 (D.C.1987).

█ Straightforward application of these principles leads us to sustain the Board's decision that the company's refusal to bargain with Local 25 was unlawful. Substantial evidence supports that Homan agreed to recognize Local 25 if a check of the cards offered by Richardson revealed authorizations from a majority of employees. No one contested that Homan had authority to bind the company. The testimony credited by the ALJ suffices to show that Homan agreed to these terms, examined the cards in sufficient detail to determine the strength of the Union's support, and acknowledged the Union's majority. At that point, the bargain was complete—the company, through its president, had voluntarily recognized the Union.

The company strenuously argues that the testimony concerning Homan's examination of the authorization cards is unworthy of belief. Credibility issues, however, are quintessentially the province of the ALJ and the Board. After evaluating the conflicting testimony, the ALJ decided that Homan had in fact checked the cards and acknowledged the Union's majority. The company's arguments to the contrary were duly considered and rejected by the ALJ and the Board. Absent extraordinary circumstances not present here, we will not disturb the ALJ's credibility determination as ratified by the Board.

The company disputes the basis on which the ALJ credited Richardson's testimony that he offered to show Homan the cards only on condition that the company recognize the Union if the signers represented a

majority. The ALJ reasoned that Richardson, an experienced organizer, would not subject union supporters to the risk of employer reprisal unless the company agreed to bind itself by virtue of a majority showing. The company maintains that this observation represents sheer speculation, entirely unsupported by the record.

We disagree. Both Richardson and the other union official present, Mr. DeLeon, directly testified that Richardson stated he would show Homan the cards only on condition. The ALJ was entitled to believe them. Nor is our decision in *Georgetown Hotel v. NLRB, supra,* to the contrary. In that case, the court overturned the Board's determination that a particular event had occurred by virtue of an improper inference unsupported by any evidence in the record. Here, in contrast, ample direct testimony supports the ALJ's position.

The company contends that, even assuming Homan checked the cards and acknowledged the Union's majority strength, he explicitly disavowed any power or intent to bind the company through voluntary recognition. After acknowledging the Union's majority status and examining the recognition agreement, according to testimony credited at the hearing, Homan stated:

> I don't have any problem with it. But, I would have to show it to my partners first. And I'll show it to them, get it signed, and then get back to you in the next couple of days.

J.A. at 78 (internal quotes removed). The company argues that these statements do not constitute evidence of commitment to bargain, which the company views as the hallmark of voluntary recognition. *See Jerr–Dan Corp.,* 237 N.L.R.B. at 303 ("[T]he key [to voluntary recognition] is the original commitment of the employer to bargain.")

In our view, the company misreads *Jerr–Dan* and similar authority. It is well-established that voluntary recognition may be highly informal. *See supra* at 1297. The clearest rule in this volatile area might well be a bright-line principle requiring written evidence of an employer's voluntary recognition. *See NLRB v. Brown and*

*Connolly,* 593 F.2d at 1374. However, that is not the law. Under the present state of the law, Homan's stated hesitation to sign the written agreement without first consulting his partners is beside the point. The ALJ found that Homan agreed upon taking the cards to recognize Local 25 if a majority of restaurant employees had signed, and further acknowledged that the cards represented a majority. At that moment, the bargain was sealed and the company committed. It was only later, when asked to execute the recognition agreement, that Homan demurred. This objection came too late. Homan had lost his right to insist on an election; the bargain had been struck. The factual findings to this effect are supported by substantial evidence, and the Board's conclusions comport fully with the law of voluntary recognition. The Board's decision must stand. .

### III.

■ We also uphold the Board's finding that certain conversations between Gil Sacks, a manager at The Broker, and two employees of the restaurant who favored the Union, constituted employee coercion in violation of section 8(a)(1) of the NLRA. In what the company depicts as a purely social conversation with two friends, Sacks stated that it was possible that the owners would close The Broker if it became unionized. The company insists that the totality of the circumstances surrounding the meeting indicates that Sacks intended no threat by his remarks.

The ALJ, however, believed the employees' testimony that the statements were taken not merely as Sacks' personal speculation, but as a friendly but subtle threat. Furthermore, we agree with the Board that a statement by Klein at a subsequent employees' meeting that "the restaurant would run as normal" did not dissipate Sacks' earlier illegal threat. The Board rightly determined that a repudiation of a threat must be clear and unambiguous, see *Pilliod of Mississippi,* 275 N.L.R.B. 799 (1985), and that Klein's statement was too general to do service for that purpose. We accordingly affirm the Board's holding that

the threatening statements by Sacks violated section 8(a)(1) of the NLRA.

## IV.

The company argues that, even if we accept the determination that the company committed unfair labor practices in violation of the NLRA, we must remand the remedial aspect of the case because the Board failed to consider a highly relevant factor in determining the appropriate remedy. The company contends that, by virtue of extraordinary turnover in The Broker's workforce since the organizational campaign in 1981, a bargaining order would impinge on the current employees' right to a bargaining representative of their own choosing as protected by section 7 of the NLRA, 29 U.S.C. § 157. While the company suggests that the factor of almost-complete employee turnover makes the bargaining order inappropriate in light of the policies of the NLRA, they insist that the Board's failure to consider this factor at all in making its remedial determination was a clear abuse of discretion. Therefore, they maintain, remand for reconsideration of the order to bargain is mandatory.

■ We disagree that the Board was required to consider turnover within the bargaining unit workforce in determining whether to issue a bargaining order. Under the precedents of this and other courts, the Board was entitled to ignore the turnover factor in the circumstances of this case. We expressly disavow our colleague's dissenting view that disregard of turnover is *always* an abuse of the Board's discretion. Like the blind man with the elephant, our colleague lays hands on a few isolated quotes and pronouncements about the importance of turnover; yet each of these addresses situations radically different from the one this case presents. The dissent finds a tail here and a trunk there, but fails to discern the larger contours of the labor law. As the following discussion demonstrates, it is not the law that consideration of workforce turnover is a mandatory part of the Board's remedial determination in this case.

### A.

This case illustrates the tension between two elements of national labor policy. On the one hand, a card majority as a basis for representative status is not viewed with unalloyed enthusiasm, since employees are subject to employer or peer pressure in signing cards, and are unlikely to be fully informed of the ramifications of their actions. *See, e.g., NLRB v. S.S. Logan Packing Co.,* 386 F.2d 562, 564–66 (4th Cir. 1967). Elections are thus favored because of their secrecy and fairness. *See NLRB v. Gissel Packing Co.,* 395 U.S. 575, 602, 89 S.Ct. 1918, 1934, 23 L.Ed.2d 547 (1968). On the other hand, an employer's voluntary recognition of a majority union also remains "a favored element of national labor policy." *NLRB v. Broadmoor Lumber Co.,* 578 F.2d 238, 241 (9th Cir.1978).

We affirm today the Board's holding that the company voluntarily recognized Local 25, and thus waived the prerogative to insist upon an election. In doing so, the company effectively agreed to treat the Union as if it won an election and to respect Local 25's status as the representative of the bargaining unit employees. So should this court, with all that this respect implies. The cases are plain that the right of a lawfully recognized union to bargain with the employer for a reasonable period is not affected by the simple fact of turnover—what Judge Bazelon has dubbed "turnover under 'neutral' circumstances," *Teamsters Local Union, 769 v. NLRB,* 532 F.2d 1385, 1391 (D.C.Cir.1967). Remand to the Board to consider turnover assigns that factor a significance which the case law denies. Because unadorned turnover is the only factor adduced to argue against a bargaining order in favor of Local 25, the Board was entitled to disregard it.

Remand to the Board in this case also offends the principle of deference to an agency's application of its organic statute which this court has repeatedly stressed in a variety of contexts. *See Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *see also, Public Service Com'n of State of N.Y. v. FERC,* 813 F.2d 448, 455

(D.C.Cir.1987); *Ganem v. Bowen,* 811 F.2d 1575, 1578 (D.C.Cir.1987); *Committee to Save WEAM v. FCC,* 808 F.2d 113, 119 (D.C.Cir.1986). In making its remedial determination, the Board operated well within the broad discretion conferred by section 10(c) of the NLRA to "fashion[ ] remedies to undo the effects of violations of the Act." *NLRB v. Seven-up Bottling Co.,* 344 U.S. 344, 346, 73 S.Ct. 287, 289, 97 L.Ed. 377 (1952). Just as the Board's choice of remedies deserves a high degree of deference from this court, see *Fibreboard Corp. v. NLRB,* 379 U.S. 203, 216, 85 S.Ct. 398, 405–06, 13 L.Ed.2d 233 (1964), the process by which it makes its determination should not be disturbed unless that process evinces "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric Power Co. v. NLRB,* 319 U.S. 533, 539–540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943). As the ensuing discussion makes plain, both the Board's decision to order the union to bargain and its decision to ignore turnover are fully consistent with the policies and purposes of the NLRA.

### B.

It is hornbook law that a union, once recognized, enjoys a presumption of continuing majority support. This widely acknowledged principle of labor law has been succinctly summarized by the Ninth Circuit Court of Appeals in *NLRB v. Tahoe Nugget,* 584 F.2d 293 (9th Cir.1978), *cert. denied,* 442 U.S. 921, 99 S.Ct. 2847, 61 L.Ed. 2d 290 (1979).

> For a reasonable time, usually one year after certification or voluntary recognition, majority support is irrebuttably presumed absent "unusual circumstances." After one year, the presumption becomes rebuttable. Absent sufficient countervailing proof, the presumption establishes, without more, the employer's duty to bargain. * * * [T]he presumption ensures the Act's most valued objective: industrial peace.

*Id.* at 297, 303–04 (footnotes omitted).

Following a one year grace period, the employer may justify a refusal to bargain by calling the union's continuing majority support into question. In order to do so successfully, however, "the employer [must] show[ ], by clear, cogent and convincing evidence, that the union was in the minority or that the employer had a good faith reasonable doubt of majority support at the time of the refusal." *NLRB v. Tahoe Nugget,* 584 F.2d at 297 (footnotes omitted). Companies relying on the defense "must come forward with easily verifiable and unambiguous evidence supporting their belief that their employees have rejected the incumbent union as a bargaining agent." *NLRB v. Koenig Iron Works,* 681 F.2d 130, 137 (2d Cir.1982). Once the employer produces "sufficient evidence to cast serious doubt on the union's continued majority status[,] [t]he presumption then loses its force and the General Counsel must come forward with evidence that on the refusal to bargain date the union in fact did represent a majority of employees in the appropriate unit." *Automated Business Systems v. NLRB,* 497 F.2d 262, 270–71 (6th Cir.1974) (footnote omitted). This allocation of burden reflects an awareness that employer's repudiation of the obligation to bargain with incumbent unions endangers the stability of the collective bargaining process. Requiring employers to demonstrate loss of union support by clear and convincing evidence safeguards "the Act's most valued objective: industrial peace." *Tahoe Nugget,* 584 F.2d at 303 (footnote omitted).

Courts vary concerning what kind of evidence supports a good faith doubt on majority status. *See* Morris, The Developing Labor Law 542–49 (2d ed. 1983). But turnover itself has never sufficed to support such a good faith doubt. Indeed, courts presume that the majority union is supported by "the same proportion of new or probationary employees." *Teamsters Local,* 532 F.2d at 1390 (citations omitted.) Thus, an employer may not rely on the simple fact of turnover to rebut the presumption of continued majority support, since allowing him to do so would negate the assumption that new employees share the pro-union sentiments of their predeces-

sors. *See, e.g., Dalewood Rehabilitation Hospital v. NLRB,* 566 F.2d 77, 79–80 (9th Cir.1977) (turnover rate cannot be only basis for good faith doubt about union's status); *NLRB v. Haberman Construction Co.,* 618 F.2d 288, 301 (5th Cir.1980) (The "union's majority position is presumed to continue, despite tremendous fluctuations in unit size occasioned * * * by huge employer turnover. [This] factor[ ] will in itself neither defeat the use of the presumption nor rebut it.") Moreover, the presumption of continuing majority support "is *most particularly* applied to industries * * * in which employment fluctuation is inherent." *Id.* (emphasis in original).

This case law makes clear that once a union is recognized, turnover that occurs between the recognition and the unlawful withdrawal of recognition has no legal significance. The dissent argues, however, that turnover occurring between the employer's unlawful repudiation of the union and the Board's remedial order must be taken into account. We see no reason to treat turnover in the second interval any differently than turnover during the first. The key legal fact in either time period is that the union has attained recognition but has not yet had the opportunity to bargain. The employer's obligation to bargain persists despite the employer's unlawful withdrawal. As long as this obligation persists, turnover does not justify an inference by the Board of loss of support.

The dissent's assertion that turnover must be considered in fashioning a remedial bargaining order flies in the face of this well-established principle: majority support is assumed, despite a change in the work force, after a union has been recognized. Just as turnover alone can never validate withdrawal of recognition as of the time of withdrawal, so turnover alone can never suffice to defeat a bargaining order during the period in which the presumption of union popularity continues unrebutted. Thus the sole fact of turnover can *never* justify denying a bargaining order for simple refusal-to-bargain violations. Since petitioner here adduces no other evidence that majority support has eroded, see *Dalewood Rehabilitation Hospital v. NLRB,*

566 F.2d 77, 79 (9th Cir.1977), the Board was relieved of any obligation to consider turnover. If only the complement of employees has changed, it cannot be an abuse of discretion to decline to consider this change, or to ignore it as irrelevant.

Moreover, to allow the employer to use the unfair labor practice proceeding to cast doubt on a duly recognized union's majority support undermines Congress' statutory scheme. The NLRA specifies particular ways in which the employer may seek to unseat an ensconced union. The employer may petition the Board for a new election. *See, e.g., NLRB v. Laystrom Mfg. Co.,* 359 F.2d 799, 800 (7th Cir.1966). Or the employer can gather objective evidence of loss of support and justify the contemporaneous refusal to bargain by presenting that evidence to the Board in another proceeding. However, "[t]o authorize the employer to assert diminution in membership in the certified union in an enforcement proceeding subverts the statutory mandate to leave these matters to the Board in separate proceedings under § 9(c)." *NLRB v. Mexia Textile Mills,* 339 U.S. 563, 568, 70 S.Ct. 826, 829, 94 L.Ed.2d 1067 (1950); *see also Franks Bros. v. NLRB,* 321 U.S. 702, 705–06, 64 S.Ct. 817, 88 L.Ed. 1020 (1944) ("After * * * a reasonable period [following union recognition], the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.") (citations omitted).

A demand that the Board take turnover into account would undermine a scheme which contemplates a separate, affirmative employer obligation to demonstrate the non-viability of a previously recognized union. Having once proved that it is entitled to bargain, the union is not obliged to prove itself again in the face of "neutral" facts having no legal significance as to representation. *See Chromalloy Minings and Minerals v. NLRB,* 620 F.2d 1120, 1132–33 (5th Cir.1980). This is precisely the renewed burden mandated by the dissent's recommendation to remand.

Moreover, our dissenting colleague would spare the "ensconced and functioning" Union this second test of support while requiring new proof of a majority from a union deprived of an opportunity to serve its members by the employer's unlawful repudiation. The case law demonstrates the illogic of this double standard. The employer's recognition alone triggers the obligation to bargain for a reasonable time. A short time interval between recognition and disavowal would, if anything, cut against the appropriateness of a new election: An employer is entitled to ask for an election at designated intervals in the bargaining relationship if he has reason to think that the Union no longer represents a majority. If there had been a long period of recognition prior to repudiation, the company would be on firmer ground in claiming that the workforce had changed and support eroded. No significant interval elapsed in this case to allow the company to claim such justification for Homan's repudiation. Since the employer had no colorable claim that the Union's status as representative was in doubt, we ought not to treat the Union as if such doubt was justified by demanding that the Board weigh turnover.

### C.

In contrast, the Board may never disregard turnover in deciding whether to order the employer to bargain with the Union in cases where the employer *withholds* voluntary recognition requested by the Union, as is his prerogative. This is the traditional *Gissel* situation, see *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), in which the employer's illegal efforts to undermine the Union aborts any effort to hold a "free and fair election" and makes impossible a definitive and undistorted demonstration of majority support. Although in both *Gissel* and withdrawal of recognition cases, the union proffers cards to initially demonstrate a majority, the union in the *Gissel* situation does not achieve the recognition status that the union in this case enjoys. Therefore, the presumption of continued majority support does not apply; in the eyes of the law, the

union has yet to prove itself. For this reason, "[a]n election, not a bargaining order, remains the * * * preferred method for determining the bargaining agent for employees." *NLRB v. Appletree Chevrolet*, 608 F.2d 988, 996 (4th Cir.1979); *see also NLRB v. Ship Shape Maintenance Co.*, 474 F.2d 434, 441 (D.C.Cir.1972).

In fashioning a remedy for the unfair labor practices that have tainted the labor-management environment, the Board is obliged to determine whether a fair election is still feasible. *See NLRB v. American Cable Systems*, 427 F.2d 446, 448 (5th Cir.) ("*Gissel* clearly contemplated that no bargaining order should be issued unless at the time the Board issues such an order it finds the electoral atmosphere unlikely to produce a fair election"), *cert. denied*, 400 U.S. 957, 91 S.Ct. 356, 27 L.Ed.2d 266 (1970). In carrying out its mission, the Board must determine whether a contemporaneous election (possibly tainted) will be a "more reliable indicator of [current] employee desires" than the original card showing. In making this assessment, "it is illogical not to consider * * * employee turnover." *NLRB v. Jamaica Towing*, 632 F.2d 208, 214–15 (2d Cir.1980).

Turnover is significant primarily as one indicator of whether the effects of the employer's coercive conduct are dissipated. In evaluating whether the unfair labor practices continue to have "an *actual chilling* effect on the possibility of a fair and free election," *NLRB v. Pace Oldsmobile*, 739 F.2d 108, 112 (2d Cir.1984), the Board must determine how many current employees were directly exposed to, and possibly influenced by, the employer's measures. *Id.; see also Ship Shape Maintenance*, 474 F.2d at 443 (turnover "strengthens [the] conclusion that the adverse effects of * * * unfair practice violation[s]" are "reasonably and adequately dissipated prior to the holding of a new representation election.").

In addition to augmenting the chances for a fair election, turnover may also be significant as a measure of whether a bargaining order would do violence to majority will at the time the bargaining order issues.

See *NLRB v. Knogo Corp.*, 727 F.2d 55, 60–61 (2d Cir.1984). However, it is only because there is no definitive—and recognized—past expression of majority support that the Board may regard the departure of employees responsible for the initial card majority as evidence of dissipation of support. The suggestion that new employees might not vote for a union, permissible in the *Gissel* context, is wholly inappropriate, and contrary to the weight of the case law, in situations such as the one *sub judice* where the Union has once been recognized and thus has secured the presumption of a continuing majority that attaches to incumbency. To import the *Gissel* calculus into this very different context deprives the duty recognized union of the presumptions to which it is entitled.

It is only in the *Gissel* case that "effectuating ascertainable employee free choice becomes as important a goal as deterring employer misbehavior." *NLRB v. General Stencils*, 472 F.2d 170, 175 n. 5 (2d Cir. 1972) (quoting *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940). Otherwise, "the Board need not establish that the union has maintained its majority * * * before issuance of a bargaining order if the order is otherwise appropriate." *General Stencils*, 472 F.2d at 175 n. 5. In a case prominently featured in the dissent, our own court has acknowledged that, while turnover is a proper part of the *Gissel* remedial assessment, "normal employee turnover in a proposed bargaining unit is not generally sufficiently [sic] ground for refusing to enforce an otherwise valid bargaining order." *Ship Shape Maintenance*, 474 F.2d at 443 (citing *Franks Brothers Co. v. NLRB*, 321 U.S. 702, 703–04, 64 S.Ct. 817, 818–19, 88 L.Ed. 1020 (1944)).

Mr. Justice Black explained the fundamental principle more than forty years ago in *Franks Bros.*, 321 U.S. at 705, 64 S.Ct. at 819:

> [T]he Board has made [its determination] in this case and in similar cases by adopting a form of remedy which requires that an employer bargain exclusively with the particular union which represented a majority of the employees at the time of the wrongful refusal to

bargain despite that union's subsequent failure to retain its majority. * * * In the Board's view, procedural delays necessary fairly to determine charges of unfair labor practices might [otherwise] * * * be made the occasion for further procedural delays in connection with repeated requests for elections, thus providing employers a chance to profit from a stubborn refusal to abide by the law. That the Board was within its statutory authority in adopting the remedy which it has adopted to foreclose the probability of such frustrations of the Act seems too plain for anything but statement.

> * * * [A]s the remedy here in question recognizes, a bargaining relationship *once rightfully established* must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed.

(citations omitted) (emphasis added). The rightfully established bargaining relationship between Local 25 and Creative Food Design has not been given a chance to succeed. A remand order would only delay the Union's opportunity to bargain on behalf of the employees it properly represents.

### D.

The dissent argues that this court's decision in *Peoples Gas System v. NLRB*, 629 F.2d 35 (D.C.Cir.1980) indicates that the Board abused its discretion by disregarding employee turnover in its decision to order Creative Food Design to bargain. *Peoples Gas* provides no support for this position. Although not a *Gissel* case, *Peoples Gas* addressed a singular factual situation that makes its holding irrelevant here. In that case, following the employer's unlawful withdrawal of recognition, the union requested, conducted, and lost an election. To put the matter simply, the ordinary presumption of continuing majority support was rebutted by an explicit and definitive expression of employee preference. This intervening election negated "the normal presumption * * * that new employees will continue to support the Union in the same proportions as do established personnel."

*Peoples Gas System,* 629 F.2d at 41. In effect, the election was equivalent to the type of objective evidence that an employer can bring forward to establish his "good faith doubt" of the union's continuing majority support. In remedying the unfair labor practice, the Board in *Peoples Gas* was free—indeed, was obliged—to make a fresh assessment of competing considerations, including deterrence, industrial stability, and the importance of respecting present majority will. Worker preference was properly weighed against the value of remedying the employer's past illegal practices and deterring future misconduct. As in the *Gissel* situation, turnover became a factor relevant to an assessment of current employee sentiment.

The dissent quotes Judge Wald's footnote in her dissent in *Conair Corp. v. NLRB,* 721 F.2d 1355, 1388 n. 1 (D.C.Cir. 1983). That footnote contains nothing to undermine our view. *Conair* is a *Gissel* case, and Judge Wald makes clear that she is addressing the importance of changed circumstances in that context. To the extent that her remarks are directed to the general significance of intervening events, she cites *Peoples Gas* to illustrate that "noteworthy events * * * [such as] the union's decisive loss in a valid election" may be worthy of the Board's consideration in deciding whether to issue a bargaining order, but affirms that "normal employee turnover" is not otherwise grounds for denying a bargaining order.

In short, *Conair* fails to support the dissenter's erroneous belief that *Peoples Gas* mandates a remand in this case. In the case at bar, unlike in *Peoples Gas,* there is no reason why the Board should doubt the union's support, or allow the employer to cast such doubt by pointing to normal changes in the workforce. *Peoples Gas* stands for the proposition that the Board need only consider "the factors which are relevant to its choice of remedies." Turnover simply is not a relevant factor here. The Board's bargaining order is

*Affirmed.*

STARR, Circuit Judge, dissenting:

I respectfully dissent. Although I agree with my colleagues that substantial evidence supports the Board's findings that the Company violated the federal labor laws, I would remand the remedial aspect of the case, inasmuch as the Board failed to consider a highly relevant factor in determining what constituted the appropriate remedy.

Preliminarily, I note my agreement with the Company's plea that Board-sponsored elections are as a general matter to be preferred to authorization cards. In addition, there is no doubt that employers, if they insist, enjoy the right to demand an election, even when a union comes forward with cards signed by a majority of the employees in a proposed bargaining unit. *See Linden Lumber, supra,* 419 U.S. 301, 95 S.Ct. 429; *Georgetown Hotel v. NLRB, supra,* 835 F.2d at 1470–71. But the law is equally clear that employers can voluntarily recognize unions and thereby waive their right to an election. *See NLRB v. Lyon & Ryan Ford, Inc., supra,* 647 F.2d at 750–51. Here, as Judge Mikva's opinion for the court amply demonstrates, the factual findings to this effect are supported by substantial evidence on the record as a whole; it is therefore clear that the Board's factual determinations must stand.

I

But that does not end the case. The Company contends that, by virtue of extraordinary turnover in The Broker's workforce since the organizational campaign occurred long ago in 1981, a bargaining order would improperly divest current employees of their right to choose whether to have a union, and if so, which one. This right, explicitly protected by section 7 of the NLRA, 29 U.S.C. § 157, is a fundamental value safeguarded by federal labor laws. Curiously, even though this argument was squarely raised below, neither the ALJ nor the Board even *mentioned* the factor of almost-complete employee turnover, and how (if at all) that development affected the Board's choice of remedies.

Now I hasten to emphasize that this is not an instance where employer intransigence and delay contributed to the protracted nature of the proceedings. *Cf. Chromalloy Mining & Minerals v. NLRB,* 620 F.2d 1120, 1132–33 (5th Cir.1980). Indeed, the Company justifiably complains that had its request for an election been granted, this matter would have been resolved long ago. For its part, the Board took several years from the conclusion of briefing to reach its decision in this case. The Company argues, quite correctly, that it should not be held responsible either for the undue length of this case or the extraordinary employee turnover that attended the prolonged period of delay. *See NLRB v. Pace Oldsmobile, Inc.,* 739 F.2d 108 (2d Cir.1984).

And, employee turnover at The Broker has indeed been extraordinary. During the long years of delay, all but three of the restaurant's employees as of August 1981 have gone on to other opportunities. See Affidavit of Stavros Veletsis, Nov. 25, 1987 (appended to Brief for Respondent). Of those three, two were card signers in 1981. *See* J.A. at 227, 228 (authorization cards for Yvonne Tyler and Juan Robles). Indeed, as of the date of the hearing before the ALJ in 1982, twenty-two of the Company's thirty-eight employees had left; at least half of the employees who had signed authorization cards had left by that time. *See* J.A. at 171, 202, 248–49. In light of this almost complete turnover, to require bargaining at this late date, the Company argues, would satisfy the wishes of only one party—Local 25. But what is more troubling to me at this juncture is that the Board failed even to discuss this relevant factor bearing on its choice of remedy.

The Board responds by emphasizing that its remedial discretion is broad. The court seconds that unexceptional point, and tosses in a citation to *Chevron* for good measure. Specifically, the Board musters impressive authority for the proposition that courts will not disturb the Board's choice of remedies after unfair labor practices have been shown. *See, e.g., Virginia Electric & Power Co. v. NLRB,* 319 U.S. 533, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943); *Franks Bros.*

*Co. v. NLRB,* 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944) (bargaining order to remedy unlawful withdrawal of recognition approved despite delay and the union's subsequent loss of majority status).

Coming down from these lofty pronouncements to focus on this case, the Board maintains that the authorities relied upon by the Company bear on remedies only in a specific context. As the NLRB sees it, courts have required the Board specifically to consider the factors of employee turnover and delay *only* under the line of cases beginning with *NLRB v. Gissel Packing Co., Inc.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). In the ordinary case, the remedy for unfair labor practices is the ordering of a Board election. Under *Gissel,* however, if an employer's unfair labor practices have rendered a fair election impossible, the Board may then issue an order to bargain forthwith. The Board argues that only in the *Gissel* context has it been obliged to consider the factor of employee turnover. In all other situations, the Board concludes, courts are not to question the Board's choice of remedies for unfair labor practices.

In my view, the Board's position is not only unduly mechanical, it is wrong as a matter of law. Contrary to the Board's assertions, this court has squarely held that the Board is to consider employee turnover and the effects of Board decisions on current employees in non-*Gissel* cases. *See Peoples Gas System, Inc. v. NLRB,* 629 F.2d 35 (D.C.Cir.1980); *Conair Corp. v. NLRB, supra,* 721 F.2d at 1388 n. 1 (Wald, J., dissenting). Furthermore, we have cited this court's decision in *NLRB v. Ship Shape Maintenance Co., Inc.,* 474 F.2d 434 (D.C.Cir.1972), a *Gissel* case, for the more general proposition that extraordinary employee turnover is a factor that must be considered by the Board. This requirement was laid down without drawing the bright-line distinction between *Gissel* and non-*Gissel* cases that the Board now urges.

In *Peoples Gas,* which is emphatically not a *Gissel* case, we stated in general terms that the Board's remedial discretion

is not so broad as to permit it to ignore a relevant factor—indeed, a factor that is explicitly statutorily protected. Subsequent cases have cited *Peoples Gas* for the general proposition that the Board (as is true of other agencies) may not ignore relevant factors in reaching its decisions. *See American Fed'n of Gov't Employees v. FLRA*, 785 F.2d 333, 336 n. 6 (D.C.Cir.1986) (citing *Peoples Gas* for the proposition that the agency must show that it "has considered the factors which are relevant to its choice of remedies"); *Florida Steel Corp. v. NLRB*, 713 F.2d 823, 834 (D.C.Cir.1983) (citing *Peoples Gas* for the proposition that the Board must consider the circumstances "in light of the violation with which it is faced and the conditions in the bargaining unit at the time it renders its decision" (internal quotes removed)); *see also NLRB v. National Car Rental System, Inc.*, 672 F.2d 1182 (3d Cir.1982).

In *Peoples Gas*, we rejected the Board's position that an unlawful refusal to bargain must be remedied by an order to bargain. In doing so, we stated:

> In its opinion in this case, the Board seems to regard a bargaining order as the automatic and "clearly appropriate" remedy for refusal to bargain. This would be so if the only interests to be balanced were those of the employer and the Union, or if it were clear that the workers' interests paralleled those of the Union. But as the Supreme Court made clear in *Gissel*, bargaining orders do not automatically flow from a refusal to bargain if it is not clear that the employees desire the Union as their representative. A balance must be drawn in such cases between the various purposes of the Act. For example, if the employer's violation is deliberate and egregious enough, the interest in deterrence of future violations may override the employees' wishes, especially if it is likely that the workers' rejection of the Union flows from the Company's violations.
>
> When the violation is less substantial or is committed in good faith, the interest in deterrence is less substantial as well. Correspondingly, the employees' rights to decide whether they want Union repre-

sentation, and by which Union, should be given greater weight; the Board should make findings as to the likelihood of infringement of those rights and explain, if it should conclude that a bargaining order is nevertheless necessary, why other remedies would not suffice and why other purposes of the Act must outweigh the employees' rights.

*Peoples Gas, supra,* 629 F.2d at 46–47 (footnotes omitted).

Here, we are entirely without the benefit of the Board's balancing of the competing policies recognized in the labor laws. *Peoples Gas* makes it plain that the rights of current employees may not be dismissed as irrelevant, even when the issue concerns the legality of an employer's good-faith refusal to bargain. Consistently, in *Conair, supra,* 721 F.2d at 1388 n. 1, Judge Wald (in dissent on another point) set forth the state of the law on the relevance of post-violation events. She stated:

> This court has required the Board to consider subsequent events only when particularly noteworthy events such as an unusually high rate of turnover, *NLRB v. Ship Shape Maintenance Co., Inc.,* 474 F.2d at 443, or the union's decisive loss in a valid election wholly free of employer coercion, *Peoples Gas System, Inc. v. NLRB,* 629 F.2d at 47–48, have been brought to the attention of the Board or the court.... [I]n neither of these ... cases had the employer been found guilty of substantial, much less "outrageous and pervasive," unfair labor practices.

721 F.2d at 1388 n. 1.

## II

In an impressive piece of advocacy, my colleagues summon up arguments that the Board, blinded by its doctrinaire approach adumbrated above, has not made (and for aught that appears, has not even thought of). I repeat: neither the ALJ nor the Board even mentioned the Company's employee-turnover argument. The reasons the court supplies for the Board's not doing so amount to classic *ad hoc* rationalizing, which is but a different species of a no-no

which should by now have been quite settled in the precincts of this courthouse. *Ad hoc* rationalizing by agencies (or by courts on their behalf) simply will not do. If the rules of the game were being followed, this portion of my dissent would be unnecessary and, without further adieu, we would send the case back to the Board where it belongs, by virtue of the analysis set forth in Part I.

But since my colleagues have undertaken to speak where the Board has been silent, I must say, with all respect, that the court's analysis represents a well-crafted but misguided exercise in formalism. The foundation of the court's rationalization of NLRB silence is the following: "It is hornbook law that a union, once recognized, enjoys a presumption of continuing majority support." Maj. Op. at 1300. Once the union is recognized, the argument goes, "turnover that occurs between the recognition and unlawful withdrawal of recognition has no legal significance." *Id.* at 1301.

It should be quite obvious that this is not the delay of which I speak, as the court itself is commendably quick to note. No one is quibbling about turnover between Homan's informal act of recognition (which of course the Company has always disputed) and the clear statement by the Company within a few days thereafter that it did not recognize the union. The point is, rather, that virtually complete turnover has occurred during the protracted period that the Board had this case pending before it for decision. And what my colleagues skillfully skirt over is that the case law on which they rely involves situations where the employer is seeking to withdraw recognition from a previously certified (or otherwise functioning) incumbent union. I have no quarrel with the settled proposition that a presumption of continued majority support exists where an employer is trying to unseat a previously certified (or otherwise functioning) incumbent union. Where an ongoing union-employer relationship exists, it is quite sensible to assume that "new" employees support the union in the same ratio as the old. The reason for this assumption is clear enough. In those circumstances, the union has been providing services to the employees—bargaining efforts, grievance handling, and the like. If employees, whether new or old, are dissatisfied with the union's performance, then that dissatisfaction will presumably be manifested in some way, say by the filing of a decertification petition.

This is not that sort of case, however. Here, we have no basis whatever for divining what the new employees' preferences are, inasmuch as the union has never provided any services of any nature on behalf of any employees, whether new or old. The new employees at The Broker have thus never been in the situation of an ongoing union-employer relationship.

What is more, our remaining faithful to the settled law of this circuit does not, as my colleagues fear, do violence to the statutory scheme crafted by Congress. Maj. Op. at 14. The labor laws do indeed, as the court emphasizes, provide ways for employers to seek to unseat "an ensconced union." But this union is "ensconced" at The Broker only in a metaphysical sense; and it became "ensconced" only after the Board finally adjudicated, years later, the issue whether Homan's act on that fateful morning back in 1981, with his business partners not even on the premises, constituted the fatal act of "recognition." Thus, in what can only be called an act of judicial prestidigitation, my colleagues take the Board's years-later decision and, with a wave of the judicial wand, "relate back" that decision to crown the union as having been "ensconced" at The Broker all the while. If the court is right that the union was indeed "ensconced" at the restaurant since 1981, then the employees at The Broker may well wonder where it was all these years. This union was as real as Harvey the rabbit. No bargaining agreements (indeed no bargaining), no grievance handling, no nothing. That is a remarkably lean legacy for a "ensconced union." And of course the reason for this Baltimore Orioles (1988 version)-type performance is that this phantom union has not in fact been at The Broker, as everyone (except the court) knows. For lo these many years, the union has not been on the scene, carrying on in the em-

ployees' behalf and representing their interests; it has, rather, been many blocks away from The Broker, downtown at the NLRB steadfastly litigating its right to be on the restaurant's premises in the first instance. This, therefore, is an "ensconced union" only in a magical, apparitional sense. It has quite plainly not been an "ensconced union" in a functional sense, which is what the case law, not to mention common sense, requires.

### III

In sum, the following points are, I believe, indisputable: first, the rate of employee turnover at The Broker has been "unusually high," and second, the employer has not been guilty of "outrageous and pervasive" unfair labor practices. The Company's conduct here cannot, in conscience, be condemned as "outrageous." It has, rather, been litigating a fairly litigable point, welcoming all the while (but to no avail) an old-fashioned, tried-and-true election.

That brings me to the final point, one of law. Section 10(c) of the NLRA, 29 U.S.C. § 160(c), sets forth the scope of the Board's remedial authority. The Board's remedial mission is to "effectuate the policies of th[e] Act." *Id.* The Board has relied here on the admittedly important statutory policies of deterring employer misconduct and, relatedly, not rewarding employers for engaging in litigation. That policy, for reasons already stated, is not fairly implicated in the present situation where the employer has stood ready from the outset to have a Board-supervised election. But, in any event, another, equally fundamental, policy of the labor laws is implicated in this case—the goal of ensuring employee freedom of association and choice. *See Virginia Electric & Power Co. v. NLRB, supra,* 319 U.S. at 539–40, 63 S.Ct. at 1218–19 (stating that the purpose of the Act is to encourage and protect "full freedom of association for workers"). Moreover, *Franks Bros., supra,* 321 U.S. 702, 64 S.Ct. 817 (which held that a union's loss of majority status during litigation does not render a bargaining order impermissible), is not, as the Board would have it, helpful to the agency's position. Indeed, the Supreme Court in that case alluded to the fact that the NLRB had specifically discussed the union's loss of majority status, and had stated its reasons for nonetheless ordering bargaining. *See* 321 U.S. at 706, 64 S.Ct. at 819. In this case, however, the Labor Board never articulated why it dismissed as irrelevant the rights of all save two of The Broker's current employees; sad to say, there is not a single word to suggest that the Board even took cognizance of the dramatically changed employment picture at the restaurant.

Under these circumstances, a remand should be ordered for the Board to *consider* the unusual facts presented by this case. On remand, the NLRB would obviously be at liberty to conclude that a bargaining order is in fact warranted. But the Board should be required to articulate its reasons for choosing one remedial course over another. *See Peoples Gas, supra,* 629 F.2d at 46–47. I am at a loss to divine any reason why the previously expressed choice of the two solitary card signers who remain with the restaurant should be honored without even considering the factor of whether their many more numerous colleagues should be given a voice in the process. Workplace democracy requires greater sensitivity than the Board, now with my colleagues' approbation, has displayed to the congressionally ordained value of employees' unfettered right to choose (or reject) a specific representative. I would therefore remand to the Board so it can carry out this basic task. As my colleagues are of different view, I respectfully dissent.