TEAMSTERS NATIONAL UNITED PARCEL SERVICE NEGOTIATING COMMITTEE and International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 385, AFL–CIO, Petitioners/Cross–Respondents,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.

UNITED PARCEL SERVICE, INC., Petitioner/Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.

Nos. 91–1314, 91–1317.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 8, 1993.

Decided March 25, 1994.

Michelle Dunham Guerra, argued the cause and filed the briefs, for petitioners in No. 91–1314. A.E. Lawson entered an appearance.

Martin Wald, argued the cause and filed the briefs for petitioner in No. 91–1317.

Margaret E. Luke, Atty., N.L.R.B., argued the cause, for appellee. With her on the brief, were Aileen A. Armstrong, Deputy Associate Gen. Counsel, Jerry M. Hunter, Gen. Counsel, and Peter Winkler, Supervisory Atty., N.L.R.B.

Before BUCKLEY, GINSBURG, and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

The Teamsters National United Parcel Service Negotiating Committee and United Parcel Service, Inc. separately petition for review, and the National Labor Relations Board applies for enforcement, of a Board order (1) requiring the Company to withdraw recognition of the Union as the representative of certain operations clerks; and (2) requiring the Company and the Union to reimburse those clerks for dues payments that had been deducted from their paychecks during the period that the Company recognized the Union as their representative. Because the order is supported by substantial evidence and is consistent with prior Board precedent concerning accretions to a bargaining unit, we deny the petitions for review and grant the Board's petition to enforce the order.

## I. Background

Prior to 1979, operations clerks at various UPS facilities were separately represented by approximately 220 different local unions, all of which were affiliated with the International Brotherhood of Teamsters. At that time, about 40% of UPS's operations clerks were not covered by a contract between UPS and a local union. In 1979, however, the Company recognized the Teamsters as the representative of all operations clerks in a new nationwide bargaining unit; and all of the local unions were merged into the national unit.

Under their new nationwide collective bargaining agreement, the Company and the Union agreed that "[e]mployees covered by this agreement shall be construed to mean, where already recognized ... clerks...." Following execution of the contract, the Union contended that this provision meant that

all clerks employed by the Company were covered by the agreement; the Company countered that only those clerks previously represented by one of the Teamster locals were covered by the agreement.

In practice, the Board found only those clerks that had previously been represented by one of the local unions were treated by the parties as represented by the Teamsters under the nationwide agreement; the other clerks were excluded from the bargaining unit. Therefore, when the parties renegotiated the agreement in 1982, the Union proposed to delete the limiting phrase ("where already recognized") from the coverage provision quoted above and the Company insisted upon retaining it. When the Union again argued in 1987 that it should be treated as the representative of all the clerks, the Company finally agreed: "effective August 1, 1987, the Employer recognize[d] [all clerks] as bargaining unit members." The new agreement also contained a union security clause that required all employees to pay dues and initiation fees as a condition of employment (where state law permitted). The Company therefore began to deduct Union dues and initiation fees from previously unrepresented clerks who completed a dues checkoff form.

Upon a charge filed by an operations clerk from whom Union dues were newly deducted in 1987, the General Counsel charged the Company and the Union with various unfair labor practices in violation of §§ 8(a)(1)–(3) and 8(b)(1)(A) and (2) of the Labor Management Relations Act. An Administrative Law Judge found that the previously unrepresented clerks had been properly accreted to the existing bargaining unit, and therefore held that there was no unfair labor practice in agreeing that the Company would recognize the Union as the bargaining representative for all operations clerks. *United Parcel Service, Inc.*, 303 N.L.R.B. 326, 330–36 (1991) (ALJ Opinion). The Board, however, rejecting the ALJ's opinion, held that the Company and the Union had violated the Act by respectively recognizing and accepting recognition for a bargaining unit within which a majority of employees had not picked the Union as their representative. *See id.* at 326–30 (Board Order); *see also International al Ladies Garment Workers' Union v. NLRB (Bernhard–Altmann Texas Corp.)*, 366 U.S. 731, 738–39, 81 S.Ct. 1603, 1608, 6 L.Ed.2d 762 (1961) (holding that "employer support of a minority union" and the minority union's acceptance of such recognition are unfair labor practices); *Human Development Ass'n v. NLRB*, 937 F.2d 657, 665 (D.C.Cir. 1991) (same). The Board ordered the Company to withdraw recognition from the Union with respect to the previously unrepresented clerks until such time as the Board might certify the Union as their exclusive representative, and ordered the Company and the Union to reimburse the clerks for the dues and initiation fees that were unlawfully collected from them.

## II. Analysis

The petitioners attack the Board's order on two fronts. First, they argue that precedent requires the Board to apply its "community of interest" standard for evaluating an accretion to a bargaining unit, under which (they claim) the accretion of the clerks would have passed muster. In the alternative they contend that the Union had majority status among the accreted clerks and was therefore lawfully recognized by the Company.

### A. Were the Clerks Lawfully Accreted?

An accretion occurs whenever new employees are added to an existing bargaining unit. In contested cases the Board generally applies a community of interest test for determining the legality of an accretion. That test involves an examination and balancing of such factors as "integration of operations, centralization of managerial and administrative control, geographic proximity, similarity of working conditions, skills and functions, common control of labor relations, collective-bargaining history, and interchange of employees." *Gould, Inc.*, 263 N.L.R.B. 442, 445 (1982).

In this case, however, the Board declined to apply the community of interest test, holding that "the fact of [the clerks'] historical exclusion [from the bargaining unit] ... is determinative" that they could not be accreted to the unit except by a

showing of majority sentiment among them. 303 N.L.R.B. at 327 (emphasis omitted). In other words, if neither the Company nor the Union insisted upon including a particular group of employees in a bargaining unit at its formation, then the excluded employees are thereafter conclusively presumed to lack a community of interest with those in the bargaining unit. Both the Company and the Union attack the Board's holding as contrary to Board precedent and therefore arbitrary and capricious. *See International Union of Petroleum & Industrial Workers v. NLRB,* 980 F.2d 774, 778 (D.C.Cir.1992).

The Board based its holding in this case on its prior decision in *Laconia Shoe,* 215 N.L.R.B. 573 (1974), in which it stated:

> When a group has in fact been excluded for a significant period of time from an existing production and maintenance unit, the Board will not permit their accretion without an election or a showing of majority among them even if no other union could obtain representative status for them.

*Id.* at 576. That decision fully supports the Board's formulation in this case—that the clerks' "historical exclusion ... is determinative" against their later accretion absent evidence of the majority's preference.

The Union, however, argues both that *Laconia Shoe* was wrongly decided—specifically, that the case upon which the Board based that decision, *Sterilon Corp.,* 147 N.L.R.B. 219 (1964), does not support the conclusion reached in *Laconia Shoe*—and that the Board has not consistently applied it to cases like the present one. As to the former point, we do not think it necessary, in view of the intervening case law, to re-examine the fundaments of *Laconia Shoe.* Both the Board and the courts recognize that the *Laconia Shoe* doctrine is critical to the protection of employees' Section 7 right to choose whether to belong to a union and if so to which one. As the Second Circuit perceptively stated the matter in *NLRB v. Stevens Ford, Inc.,* 773 F.2d 468 (1985):

> If groups of employees may be permissibly accreted to a bargaining unit after they have been earlier excluded from an election in that unit, strategic selection of one

group for election purposes followed by accretion will lead to a larger bargaining unit in which the bargaining representative does not have majority status. Such bootstrapping violates the Act's policies favoring the free choice of employees.

*Id.* at 474; *see also King Radio Corp.,* 257 N.L.R.B. 521, 526 (1981) (no accretion of group excluded when bargaining unit was formed regardless of commonality of interests).

■ The petitioners' argument that the Board has not applied *Laconia Shoe* consistently rests primarily upon its decision in *St. Regis Paper,* 239 N.L.R.B. 688 (1978), *aff'd,* 255 N.L.R.B. 72 (1981), *enf'd,* 674 F.2d 104 (1st Cir.1982). The employer in that case had entered into a collective bargaining agreement that was expressly limited to the mechanics at its garage in Bucksport, Maine. When the company later opened an additional garage at First Lake and staffed it by transferring union members from the Bucksport facility, it recognized that the transferred mechanics continued to be represented by the Union, but it refused to renegotiate the provision of the collective bargaining agreement limiting its coverage to the Bucksport garage. Eventually, the employer hired new non-union mechanics for the First Lake garage and transferred the union members back to Bucksport.

The Board found that the new mechanics at the First Lake facility had lawfully been accreted to the Bucksport bargaining unit, in part because the First Lake mechanics "had been governed by the contract between [the employer] and the union [even though] the contract purported to cover Bucksport only." To our reading, this suggests that the accretion occurred when the new garage was opened, and that no employees were ever "historically excluded" from the bargaining unit. *St. Regis Paper* does not, therefore, demonstrate that the Board has failed to apply the *Laconia Shoe* rule consistently.

Nor does *Lammert Industries v. NLRB,* 578 F.2d 1223 (7th Cir.1978), which involved the physical consolidation of one union facility with 19 employees, and one non-union facility with seven employees, into a new

facility. In *Lammert*, the Board ultimately found that the union retained its majority status at the new facility and therefore permitted it to represent all 26 employees. Although the combination of the previously unrepresented employees with the existing bargaining unit was (rather loosely in our view) termed an accretion, *Lammert* is uniquely addressed to the physical consolidation of a union and a non-union facility at a single location; it has no application to the accretion of employees who had historically been excluded from a bargaining unit. Therefore, the petitioners have failed to document their claim that the Board has not applied *Laconia Shoe* consistently since it was decided.

Finally, the petitioners argue that if the Board is to apply the rule of *Laconia Shoe*, then precedent and the facts of this case require it (1) to find that the Union did not acquiesce in the exclusion of any clerks from the bargaining unit and (2) then to weigh the Union's nonacquiescence heavily in its analysis of whether a lawful accretion occurred. According to UPS, for example, "*Laconia Shoe* makes clear that the question of union acquiescence remains essential to an accretion analysis." UPS Br. at 19. In sharp contrast, the Board maintains that it is irrelevant whether the Union acquiesced in the clerks' exclusion, and that in any event the Board properly found that the Union had acquiesced in their exclusion when it accepted a contract that did not include them in the national bargaining unit.

In deciding this case, the Board clearly treated acquiescence as irrelevant to the exclusion issue. *See* 303 N.L.R.B. at 327. Nor does any of the accretion decisions that the petitioners cite demonstrate that the Board has previously deemed acquiescence a prerequisite to finding that the historical exclusion of certain employees barred their accretion to an existing bargaining unit. *Sunar-Hauserman*, 273 N.L.R.B. 1176 (1984), a case upon which the petitioners rely heavily, arose from a unit clarification petition; it is simply inapplicable in the accretion context. Even if *SunarHauserman* were applicable, moreover, it would not sustain the petitioners' position. In that case, the Board found that "[t]he Union did not abandon its proposal to include [in the unit the new position of] dock auditor in exchange for a concession during bargaining" but rather expressly preserved its right to seek a bargaining unit clarification. *Id.* at 1177. In contrast, here the Teamsters twice agreed to the "where already recognized" limitation on the bargaining unit and never reserved the right to seek, much less sought, a bargaining unit clarification. Indeed, the Union claims only that it proposed to eliminate the exclusionary clause in later contract negotiations and in the interim pressed the Company on the matter.

Similarly, the petitioners assert that in *Color Tech Corp.*, 286 N.L.R.B. 476 (1987), the Board based its no-accretion holding crucially upon the union's not having initially sought to cover the disputed employees in its collective bargaining agreement. The Board did indeed note that the union had never sought to include the allegedly accreted employees in the bargaining unit, but it recounted that merely as evidence of their historical exclusion from the unit. *See id.* at 487. Nowhere in that case did the Board indicate that union acquiescence *vel non* in the employees' exclusion is a factor to be considered in determining whether the historical exclusion of a group of employees precludes their later accretion.

The only decision that even remotely supports the petitioners' position is *King Radio Corp.*, 257 N.L.R.B. 521 (1981), in which the Board mentioned that the union had in the past "consciously excluded" the employees that it was then seeking to include by accretion in the bargaining unit. *See id.* at 526. In context, however, it is clear that the Board treated that fact as nothing more than additional evidence of the employees' historical exclusion.

In sum, the cases cited by the petitioners suggest only that the Board considers a union's course of conduct as a factor in determining whether a group of employees was in fact historically excluded from a bargaining unit. To infer from this, however, that the union's acquiescence is a prerequisite to the Board's finding that a group of employees was historically excluded would be significantly to overread the cases.

Never having held, in terms or de facto, that the union's acquiescence is a prerequisite to finding that employees were historically excluded from a bargaining unit, the Board was not obliged to determine whether the Union in this case acquiesced (as a matter of law) in the exclusion of certain clerks from the nationwide UPS bargaining unit, or if it did not, whether its nonacquiescence means that the employees were not (again, as a matter of law) historically excluded from the unit. Therefore, the previously unrepresented clerks could not be incorporated into that unit absent a showing of majority support among them for the union.

### B. Did the Union Have Majority Support?

The petitioners argue next that the Board's order should be set aside because the General Counsel failed to show that the Union lacked majority support among the allegedly accreted clerks. If the Union had such majority support, then the Company was of course entitled to recognize it as their exclusive bargaining representative.

■ The law is clear that "in cases alleging unlawful 8(a)(2) recognition, it is the burden of proof of the General Counsel to establish that the union accorded recognition was not the majority representative." *Rainey Security Agency, Inc.*, 274 N.L.R.B. 269, 279 (1985) (internal quotations and citations omitted). It is equally clear that in meeting his burden of proof, the General Counsel must rely upon "more than conjecture," i.e., must produce evidence that the Union did not enjoy majority support. *American Beef Packers*, 187 N.L.R.B. 996, 997 (1971), *enf'd*, 463 F.2d 818 (D.C.Cir.1972); *see also Regency Gardens Co.*, 263 N.L.R.B. 1265, 1269 (1982).

The record in this case is also clear. To quote the Board, it was

undisputed that the Employer did not ask for and the Union did not proffer proof of majority support for the Union in the group of previously unrepresented employees. An official of the Union testified about his belief that the Union had majority support in this group, but he admitted that he had no 'papers,' including authorization cards, to support this belief.

303 N.L.R.B. at 326. Further, we note that prior to prosecuting the complaint in this case, the General Counsel subpoenaed "all books, papers, documents, correspondence, notes or other writings showing that on or before August 1, 1987, a majority of operations clerks employed by UPS who had not been represented by the Teamsters prior to August 1, 1987 designated the Teamsters as their collective bargaining representatives." Hearing Trans. at 55. The Union produced nothing in response. At the hearing before the ALJ, a Union official confirmed that he had "no records or papers to verify that." *Id.* Instead, he testified that he believed that the Union had majority status solely upon the basis of conversations he had had with various of the previously unrepresented clerks. *See id.* at 53.

The petitioners' argument raises the question whether the Board could properly find that the General Counsel discharged his burden of proof by showing that the Union's claim to majority support was entirely impressionistic and unsupported either by documentation or by any other indicia of employee sentiment. In another context we might well doubt whether the General Counsel's reliance upon these facts amounts to anything "more than conjecture." There is, after all, no general requirement that a union have documentary or indeed any specific type of evidence, such as authorization cards, to support its claim to majority support.

The General Counsel's burden should be sensitively calibrated, however, to the context in which it must be carried—in this case, a context formed by the doctrines of accretion and historical exclusion. We repeat the passage from the Board's opinion in *Laconia Shoe*, quoted above: "When a group has in fact been excluded for a significant period of time from an existing production and maintenance unit, the Board will not permit their accretion without an election or a showing of majority among them even if no other union could obtain representative status for them." 215 N.L.R.B. at 576. With this statement of the substantive law in mind, we do not see how the General Counsel could be expected to prove more, in his prima facie case against

accretion, than the fact that the employees in question were historically excluded from the putative bargaining unit. It was, of course, open to the Union to rebut the General Counsel's prima facie case by producing some reliable evidence of its majority status, but it failed to do so.

■ We see a close analogy between the manner in which the Board allocated the burden of proof in this case and the way in which the Board proceeds when an employer has withdrawn its recognition of a union that it had recognized either voluntarily or after certification by the Board. Such a union benefits from the presumption of continued majority status. *See, e.g., Sullivan Industries v. NLRB*, 957 F.2d 890, 897 (D.C.Cir. 1992). Hence, if the employer ceases to recognize and to bargain with the union, it commits an unfair labor practice unless it can demonstrate, based upon clear and cogent evidence, that it had a "good faith reasonable doubt" as to the union's majority status. *See, e.g., Sullivan Industries*, 957 F.2d at 897–98; *NLRB v. Creative Food Design Ltd.*, 852 F.2d 1295, 1300–01 (D.C.Cir.1988). If the employer succeeds in making this showing, the burden then shifts to the General Counsel to produce evidence that the union did, in fact, enjoy majority support when the employer withdrew its recognition from the union. *See Creative Food Design*, 852 F.2d at 1300.

■ Although the roles are reversed here, the situation is essentially similar. By showing that the disputed clerks had historically been excluded from the Teamsters Union, the General Counsel cast substantial doubt upon the Union's majority status among them. This doubt, which is founded upon fact and is thus "more than conjecture," is enough in the context of an alleged accretion, to satisfy the General Counsel's burden. The burden then shifted to the Union and the Company to demonstrate that the Union was, in fact, supported by a majority of the disputed clerks when the Company recognized it as their representative.

■ In light of the Board's explanation of the policies that underlie the accretion doctrine, this manner of proceeding makes emi-nently good sense. If a union and an employer could accrete unrepresented employees to an existing unit merely by claiming to be under the impression that the union has majority support among them, then the accretion doctrine would do little to protect the employees' right not to be represented by that union. In other words, it is reasonable for the Board to presume that, absent some indication to the contrary, the majority of a group that has historically been excluded from a bargaining unit does not support the union that represents that unit. Without any affirmative evidence that the union has obtained majority support—such as a response to a union organizational campaign—there is simply no basis upon which to believe that the union in fact enjoys majority support. Having shown that there is no such basis in this case—and he can hardly do more to prove the negative—the General Counsel made his prima facie case; it was then up to UPS and the Teamsters to rebut him, and this they utterly failed to do. Hence, the Board properly concluded that the Union lacked the necessary majority support when the Company recognized it as the representative of the previously unrepresented clerks.

### III. Conclusion

In sum, we find that the Board properly applied its prior decisions to conclude that the unrepresented clerks employed by the Company could not lawfully be accreted to the existing bargaining unit without a showing of majority support among them for the Union and that the Union did not in fact enjoy majority support among them. Therefore, we grant the Board's petition for enforcement and deny the Company's and the Union's petitions for review.

*So ordered.*